**STATE of Tennessee, Appellee**

v.

**Robert RENNER, Appellant.**

Supreme Court of Tennessee,
at Knoxville.

Dec. 11, 1995.

Edward C. Miller, Dandridge, for appellant.

Charles W. Burson, Attorney General & Reporter, Nashville, Christina Shevalier, Assistant Attorney General, Al Schmutzer, Jr., District Attorney General, Sevierville, for appellee.

## OPINION

BIRCH, Justice.

We accepted the defendant's, Robert Renner, application in order to clarify the "no duty to retreat" rule as generally applied within the broad context of the law of self-defense [1] and, specifically, as the rule applies to the narrow facts and circumstances of this case. The issue is whether the prosecutor, by either cross-examination or argument, misled the jury by suggesting the existence of a "duty to retreat" rule. This suggestion, Renner contends, prejudiced and deprived him of a fair trial. The Court of Criminal Appeals concluded that Renner had received a fair trial. We are of the same opinion and affirm the judgment.

---

**1.** Tenn.Code Ann. § 39–11–611(a) provides, in part, that "[t]here is no duty to retreat before a person threatens or uses force [in self-defense]."

After a jury trial, the defendant was convicted of first-degree murder in the shooting death of Greg Shuttles. On the evening of the shooting, Robert Renner was visiting with Micki Reynolds and her five-year-old son in their apartment. Renner and Reynolds had lived together but, at that time, were separated. Renner was there, ostensibly, to visit with the boy, with whom he was close. Shuttles, the victim, had spent the day in the apartment. Renner knew that Shuttles was there when Renner arrived, Shuttles was sitting on a couch watching television.

Shortly after arrival, Renner and Shuttles argued briefly. Renner and Reynolds then went into the kitchen to talk. He attempted to convince her to resume their relationship; he told her that she was "playing with fire"— a reference to her relationship with Shuttles. The conversation ended, and Reynolds accompanied Renner to the boy's room. After spending some time with the boy, Renner returned to the kitchen to get a *Popsicle* for the child and beer for himself. While there, he claims to have heard Shuttles load a firearm. Renner explained that he knew Shuttles was always armed; he testified also that he knew Shuttles was "high" on the evening in question. In light of this knowledge, Renner stated that when he heard Shuttles loading his firearm, he feared for his safety and pulled out his own firearm. He decided to leave; he passed through the living room to the front door. He claims that as he was making his way to the door Shuttles, reaching into his rear pocket, threatened to kill him. Seeing this movement, Renner shot Shuttles, who died as a result of the wounds. Hospital personnel removed a loaded firearm from Shuttles' rear pocket.

At trial, the prosecutor asked Renner whether there was a way to exit the apartment from the kitchen. Renner responded that although there was an exit door in the kitchen, it was broken and unusable. During closing argument, the prosecutor again referred to the kitchen door and suggested that it afforded Renner a way out, which, if taken, would have permitted him to avoid a confrontation with Shuttles in the living room.

As stated, the Court of Criminal Appeals considered the issue and affirmed the conviction. The court was not, however, unanimous. Judge Paul G. Summers, who wrote for the "majority," reasoned that the questions asked by the prosecutor on cross-examination of the defendant were relevant on the issue of credibility and did not suggest the existence of a duty to retreat. Judge Penny White, now Justice White, concurred in the "majority's" result, although on different grounds. She concluded that the questions and statements under discussion shed light on the issue of reasonableness of the force employed under the circumstances. Judge John L. Byers, former Presiding Judge of the Court of Criminal Appeals, dissented. He found, in essence, the prosecutor's argument to be that "a person must retreat before he is threatened." This, Byers wrote, derogated the "no duty to retreat" rule and constituted reversible error.

We turn now to the "no duty to retreat" rule in general and to its application in the case under submission. Until recently, Tennessee has traditionally followed the common law "duty to retreat" rule. Under this rule, one is required to retreat, "if reasonably feasible, except in defense of one's home or habitation or in the discharge of official duty." *State v. Kennamore,* 604 S.W.2d 856, 858 (Tenn.1980).

In *Kennamore,* our Court was presented with a clear invitation to abolish this common law principle and adopt the "no duty to retreat" rule. At issue in *Kennamore* was whether the trial court had erred in refusing to give special jury instructions requested by the defendant. Observing that the requested instructions embodied the "true man" doctrine, which effectively created a "no duty to retreat" rule, the Court declined to find error in the trial court's rejection of the requested instruction. Essentially, the *Kennamore* Court rejected the "no duty to retreat" rule. 604 S.W.2d at 858.

In 1989, the General Assembly added a "no duty to retreat" rule to the law of self-defense. This legislation, now codified in the Tennessee Code, provides:

A person is justified in threatening or using force against another person when and

to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.... *There is no duty to retreat before a person threatens or uses force.*

Tenn.Code Ann. § 39–11–611(a) (1989) (emphasis added). With this enactment, Tennessee joined the majority of jurisdictions which adhere to the "true man" doctrine. *See, e.g., Brown v. United States,* 256 U.S. 335, 41 S.Ct. 501, 65 L.Ed. 961 (1921); *Alberty v. United States,* 162 U.S. 499, 16 S.Ct. 864, 40 L.Ed. 1051 (1896); *Beard v. United States,* 158 U.S. 550, 15 S.Ct. 962, 39 L.Ed. 1086 (1895); *State v. Jackson,* 94 Ariz. 117, 382 P.2d 229 (1963) (*en banc*); *People v. Lewis,* 117 Cal. 186, 48 P. 1088 (1897); *People v. Williams,* 56 Ill.App.2d 159, 205 N.E.2d 749 (1965); *Sikes v. Commonwealth,* 304 Ky. 429, 200 S.W.2d 956 (1947); *Haynes v. State,* 451 So.2d 227 (Miss.1984); *State v. Neal,* 604 P.2d 145 (Okla.Crim.App.1979); *Voight v. State,* 53 Tex.Crim. 268, 109 S.W. 205 (1908). For a discussion and collection of the early cases on the duty to retreat, see Annotation, *Homicide: Duty to Retreat When Not on One's Own Premises,* 18 A.L.R. 1279 (1922).

■ Under the "true man" doctrine, one need not retreat from the threatened attack of another even though one may safely do so. Neither must one pause and consider whether a reasonable person might think it possible to safely flee rather than to attack and disable or kill the assailant. *Brown,* 256 U.S. at 343, 41 S.Ct. at 502. Moreover, this doctrine applies only: (1) when the defendant is without fault in provoking the confrontation, and (2) when the defendant is in a place where he has a lawful right to be and is there placed in reasonably apparent danger of imminent bodily harm or death. *Beard,* 158 U.S. at 561–62, 15 S.Ct. at 966; *Runyan v. State,* 57 Ind. 80 (1877). Specifically, the *Beard* Court stated:

[A] true man who is without fault is not obligated to fly from an assailant....

... The weight of modern authority ... establishes the doctrine that, when a person, being without fault and in a place where he has a right to be, is violently assaulted, he may, without retreating, re-

pel force by force, and if in the reasonable exercise of his right of self-defense, his assailant is killed, he is justifiable.

158 U.S. at 561–62, 15 S.Ct. at 966 (citations omitted). As in all cases of self-defense, the force used must be reasonable, considering all of the circumstances. Moreover, the "true man" rule implies no license for the initiation of a confrontation or an unreasonable escalation of a confrontation in progress.

■ Whether the "true man" rule applies in a particular case is a matter to be determined by the jury. The jury determines not only whether a confrontation has occurred, but also which person was the aggressor. It also decides whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault. Thus, a defendant may expect only that the jury be properly instructed regarding the law of self-defense (including the "true man" doctrine), thereby enabling the jury to correctly apply the law to the facts as it finds them.

The contention the defendant here principally presses is that the questions posed by the prosecutor on cross-examination as well as portions of his argument to the jury suggested that the defendant was required to retreat. With regard to the cross-examination:

Q: Now, when you heard him, then, of course, you were in the kitchen?

A: Yes.

Q: And there was still that back door right there, wasn't there?

■ We, however, find that this question and those like it were useful in eliciting testimony relevant to many of the issues the jury would later determine: (1) the circumstances under which the confrontation occurred, (2) whether Renner was lawfully on the premises, (3) whether Renner's conduct under the circumstances was reasonable, and (4) whether Renner perceived himself to have been in imminent danger. As stated, these are factual issues for the jury to resolve, and by asking them, the prosecutor simply sought, in our opinion, to adduce illuminative testimony. Therefore, we conclude that nothing in the questions asked by the

prosecutor on cross-examination establishes reversible error.

The defendant contends also that the prosecutor's closing argument constitutes reversible error. The protested portion of the closing argument is as follows:

> You listen to His Honor because he's not going to tell you that he doesn't have to retreat before it starts. The only time self defense comes into play and the duty to retreat comes into play is after someone has assaulted you, or somebody has come on to you, threatening to hurt you or do you great bodily harm, or to kill you. At that point you have no duty to retreat. That's not when we're talking about. Even by his own testimony, nobody attempted to assault him. Greg Shuttles, the mean man, was just sitting there watching television.

This question is a closer one because we find that the prosecutor misstated the law. Specifically, he said, "[t]he only time self defense comes into play and the duty to retreat comes into play is after someone has assaulted you, or somebody has come on to you, threatening to hurt you or do you great bodily harm, or to kill you." This statement is inaccurate because it necessarily implies that the "true man" rule engages only after an assault has occurred.

■ We cannot find that the statement, although inaccurately (and perhaps inartfully) stated, caused the grievous harm the defendant suggests. First, as Judge White concluded in her concurring opinion in this case, the issue is waived because the defendant failed to object. Tenn.R.App.P. 36(a); *State v. Gregory*, 862 S.W.2d 574, 578 (Tenn. Crim.App.1993). Further, the trial judge correctly instructed the jury that a person has no duty to retreat; consequently, the error did not "affect the result of the trial on the merits." Tenn.R.Crim.P. 52(a). Moreover, the jury was instructed that "[s]tatements, arguments, and remarks of counsel are intended ... to help you in understanding the evidence and applying the law, but [they] are not evidence." Thus, we find the error to be "harmless."

For all of the foregoing reasons, the judgment of the Court of Criminal Appeals is affirmed.

ANDERSON, C.J., DROWOTA and REID, JJ., and WADE, Special Justice, concur.