IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 10, 2006

## STATE OF TENNESSEE v. CORY LYN CLARK

**Direct Appeal from the Circuit Court for Gibson County
No. 7286    Clayburn Peeples, Judge**

_____

**No. W2005-01020-CCA-R3-CD  - Filed August 2, 2006**

_____

The defendant, Cory Lyn Clark, was convicted of second degree murder (Class A Felony) and sentenced to twenty years in the Tennessee Department of Correction as a violent offender. The defendant contends on appeal that: 1) the evidence was insufficient to support his conviction because he claimed self-defense; 2) the trial court improperly admitted his second statement to police because a tape recording of the statement was no longer available; and 3) the sentence was improper. We conclude that the evidence was sufficient to support his conviction, that the defendant failed to preserve his appeal of the lost evidence by failing to object at trial, and that the sentence was proper. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID G. HAYES and ALAN E. GLENN, JJ., joined.

D. Nathaniel Spencer, Brownsville, Tennessee (on appeal), and Ramsdale O'Deneal, Jackson, Tennessee (at trial), for the appellant, Cory Lyn Clark.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; Garry G. Brown, District Attorney General; and Elaine G. Todd and Edward L. Hardister, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

Facts and Procedural History

The defendant shot and killed Nakia Partee, the mother of his child, during an altercation in his bedroom. The defendant claimed that he shot the victim in self-defense after the victim allegedly picked up a knife and stabbed him.

At the trial, Lieutenant Bill Baker, Assistant Chief of Police for Humboldt, testified that he investigated the death of the victim. He was off-duty when he learned of the shooting and of the presence of the defendant with a stab wound at the police department. He said that when he arrived, Sergeant Tony Williams had secured the scene and Officer Mike Lewis had begun an investigation. Additionally, Melvin Stewart, the defendant's uncle, and Louetta Whitehorn, the defendant's grandmother, were present. He testified that they found the victim's body in the defendant's bedroom between the bed and the dresser and found the knife near the body, next to the dresser. Additionally, they discovered a bullet casing beneath the victim's chest, twelve inches from the right corner of the bed. The victim had gunshot wounds to the left cheek and to the top right-hand side of the back of her head. He said they sent the body for an autopsy. He also testified that he did not recall seeing blood on the victim's hands. Lieutenant Baker said the defendant came to the police department after the incident. Officer Lewis later read the defendant his Miranda rights and took the defendant's statement in the presence of Lieutenant Baker at approximately 11:47 p.m. The recorded statement was played for the jury at trial, and the jurors were furnished with a transcription to follow as the tape played. No objection was raised to either the playing of the tape or the transcript. Lieutenant Baker testified that the defendant indicated that he was standing with his arms extended when he fired at the victim. He said that the defendant indicated that he placed the weapon under some shrubbery at the police station before entering, and officers later found the gun in that location. He said that the TBI ballistics analysis indicated that the bullet and casing were discharged from the recovered weapon. He testified that the defendant's only wound was to his arm and that he had sustained no apparent defensive wounds. The knife was submitted for analysis but they were unable to develop any fingerprints from the knife. He further testified that a second statement was taken from the defendant a few days later, but no tape recording was available at trial. A transcription of the second statement was read aloud to the jury. He noted that during the second statement, the defendant attempted to explain why the victim was shot in the back of the head as opposed to the face, as he had originally stated.

On cross-examination, Lieutenant Baker testified that Reserve Officer Kenny Perry discovered the weapon and turned it over to Officer Lewis. At that time, there was a hair on the muzzle of the weapon but it was lost between the recovery of the weapon and the trial. He acknowledged that the evidence was compromised and that they "should have the hair, but []do not." He further acknowledged that the tape recording of the second statement was lost. He reiterated that no fingerprints were found on the knife. He said that the gun was fired at close range and that he could not definitively say that the victim, in a struggle with the defendant, did not turn at the moment that the shot was fired. He said that different questions were asked in the first and second interviews. He said that they asked the location of the gun in the first interview and that the defendant said he did not want to walk into the police department with a gun so he threw it in the shrubbery. He said that the defendant was forthright about the location of the weapon and was cooperative throughout the interviews.

On redirect examination, Lieutenant Baker testified that the transcript of the second interview accurately reflected the contents of the interview. He said that people do not always leave fingerprints. He also said that if the murder weapon were held close to a foreign object, it might

become trapped between the slide and the barrel "before it cycles." He noted that for the defendant's arms to be outstretched, as he admitted they were, the victim would have to have been at least an arm's length away from him. He also said that if she had turned away, she would not have posed a threat to him. On re-cross, he testified that no prints were taken from the gun. He agreed that there were things that "could've [been] done differently" and admitted that the taped statement should not have been lost.

The next witness to testify was Officer Mike Lewis. Officer Lewis testified that he is currently employed as a patrol officer with the Collierville Police Department but was formerly employed as an investigator with the Humboldt Police Department. He said that he was the investigator in the death of the victim on October 19, 2002. He said that he was working at the police department when the defendant walked in and stated that he had shot someone at 115 Ethridge Street. The defendant said that his girlfriend had stabbed him, and Officer Lewis testified that he observed only the stab wound to the defendant's left arm. He testified that he responded to the scene and found the victim lying dead on the floor in the back bedroom. He said that Mr. Stewart and Ms. Whitehorn were in the front of the house when he arrived on the scene. He said that the defendant stated during an interview that he retrieved the weapon from a top right drawer in the bedroom. He further said that when they arrived, he noted that the dresser drawer was closed. He said that the drawer "was stuffed with quite a bit of stuff, papers, et cetera" and that he was not able to open the drawer with one hand because it was so full.

On cross-examination, Officer Lewis testified that he collected the evidence and took a recorded statement from the defendant. He said that the defendant was cooperative. He said that he did not ask the defendant if he closed the drawer and that he did not take a statement from anyone else regarding the drawer. He said he also collected the knife and took photos of the crime scene. He was unable to lift prints from the knife and did not analyze the gun. He said that he conducted a second interview to ask further questions and that he recorded both statements. He acknowledged that the tape of the second interview was relevant, that it was now unavailable, and that this was the first time that he had lost a tape. He said that he was not involved in the interview with Melvin Stewart. He also said that he did not take pictures or ascertain the extent of the defendant's injuries.

On redirect examination, he testified that during the first interview, the defendant stated that the victim was facing him when he shot her. Officer Lewis further testified that he subsequently learned that the victim had been shot in the back of the head. He again testified that he did not ask the defendant if he shut the dresser drawer, but the defendant did not indicate that he shut the drawer in relaying his version of the time line of events as they occurred. He said the hospital treated and released the defendant. On re-cross, he testified that he did not accompany the defendant to the hospital.

The next witness was Sergeant Tony Williams of the Humboldt Police Department. He testified that he was the first officer to respond to the crime scene. He said that he found four subjects in front of the house when he arrived and that they indicated that the victim was in the

bedroom. He said that the victim had a bleeding head wound. He called the paramedics who verified that the victim was dead.

Next, Reserve Officer Kenny Perry of the Humboldt Police Department testified that he went to assist Sergeant Williams in responding to the crime scene. He said that they secured the scene and the vehicle that the defendant drove to the station. He testified that he discovered the weapon underneath some shrubbery outside the station, approximately eight to ten-feet from the vehicle.

Next, Melvin Stewart, Jr., testified that he lives at 115 Etheridge and that he is the defendant's uncle. He was at the house on the night that the victim was killed. He said he saw the defendant, the victim, and their child in the yard between 7:00 and 7:30 p.m., but he did not overhear their conversation. He testified that the defendant brought the child into the home, that the victim returned about half an hour later, and that she "didn't look real happy." Stewart said that the victim went into the bedroom, and he heard "a pop." Then the defendant came out of the bedroom, said the victim had cut him, and told him to "see about the baby." He said that the defendant left but did not say where he was going. He also said that he never saw a gun. He went into the bedroom and got the baby. He said that his mother, Louetta Whitehorn, arrived at the home and that the police arrived shortly thereafter. He did not know what the defendant did after going outside. He said that his mother went into the bedroom but that she did not touch or move anything. He said he did not hear the defendant cry out in pain before the "pop."

On cross-examination, he again said the defendant brought the child into the house and that neither the defendant nor the victim "seem[ed] too happy." He said that he saw the victim on the floor after he went in to get the child and that he did not believe the child realized what had happened. He did not remember if the defendant came back to get keys but he heard the car leave. He had never heard the defendant and victim arguing prior to this incident. He said that the defendant took care of the child "every time that [the victim] needed him to." He said that the child has cerebral palsy. He did not hear the victim say why she came back the second time.

On redirect examination, he estimated that the defendant kept the child seven or eight times between the time he and the victim ended their relationship in April and the time of the victim's death. He did not recall giving the police a statement after the incident. He said that he "may have" told the police that he was "half-asleep" and dozed off when the victim and defendant were in the bedroom.

The next witness to testify was Christie Ball. She testified that she was at the victim's apartment on the day that she died. She arrived around 6:00 p.m. to accompany the victim to Jackson, Tennessee, to attend Homecoming festivities at Lane College. She said the defendant came to the apartment shortly after she arrived. She heard the victim repeatedly tell the defendant to leave, and she believed that he was bringing their child back to the victim. She said that the victim pushed him out of the door and that he hit the door and left. She said he left the child and took the victim's cellular phone. She said that the victim left to retrieve her cellular phone at the defendant's house and to take the child to her mother's house in Milan.

Next, Denetta Bryson testified that she was a close friend to the victim. She said that the relationship between the victim and defendant ended approximately seven months before the victim's death. She recalled that in May 2002, she was with the victim when the defendant approached her and they began arguing. She said the defendant told the victim that "if he couldn't have her that, you know, he would kill her." The victim also let her listen to phone messages left by the defendant approximately one week before her death in which he expressed anger that she was going out, cursed at her, and threatened to kill her. The defendant called the victim more than thirty times in a forty-five minute span in which she heard the defendant "yelling, screaming, and cursing." During cross-examination, she testified that she spoke to the police about the phone conversations and messages. She said she did not know if the officers listened to the messages or if they obtained the victim's cellular phone records.

Next, Lynn Bailey testified that she was a cousin of the victim but did not know the defendant. She said that after the defendant and the victim ended their relationship, the victim tried to develop a social life. Bailey testified that she had listened to approximately nine messages on the victim's cellular phone, one of which indicated that if the defendant could not have the victim, no one could.

Next, Tangi Bailey testified that she was a cousin of the victim and that they worked together for two and a half to three years. She said that the defendant and victim had ended their relationship six months prior to the victim's death and that they had argued from that time until her death. She said that she heard a voice mail message left by the defendant on the victim's phone in which he implied that the victim was not answering the phone because she was having sex with another man. She also stated that the defendant would show up at the victim's place of work unexpectedly after their breakup.

During cross-examination, Ms. Bailey admitted that there was never an altercation at the victim's job site. She claimed that the victim would ask her if she had seen the defendant out with other women and that she responded that she had seen him out on several occasions. On redirect, she said that the victim's mother usually kept the child when the victim went out and that the defendant only kept him overnight "twice or so."

Next, Lieutenant Baker was recalled and testified that the defendant stated in his interviews that he had left messages on the victim's cellular phone regarding their son but denied that he threatened to kill her or himself.

The next witness to testify was Dr. Teresa Campbell, assistant medical examiner to the regional forensic center in Memphis. She testified that her autopsy on the victim determined that the cause of death was a contact gunshot wound to the head. She said that there was no drugs or alcohol in the victim's system at the time of death. She said that the entrance wound was the top right of the back of the head and that the exit wound was in the left cheek. She testified that a "contact wound" indicated that the muzzle of the gun was against the skin at the time the gun was fired. She said that the injuries were consistent with a hard contact wound, which indicated pressure

applied to the skin at the time of discharge. On cross-examination, she said that the victim had no injuries other than the gunshot wounds and that she could not determine the position of the defendant or the victim from the injuries.

The State rested its case, and the defendant presented a motion for a judgment of acquittal, which was overruled. The defense began their proof by calling an acquaintance of the defendant.

Andrea Vinson testified that she had a six-year relationship with the defendant. She said that during her relationship with the defendant, the victim followed them in a vehicle at a high rate of speed, forcing the defendant to stop and speak with the victim. She said that they argued on a second occasion outside a Long John Silver's restaurant.

On cross-examination, she testified that the defendant dated both women at the same time. She said that the defendant called her on the night of the victim's death. She further stated that she was unable to hear the conversation between the defendant and victim at the Long John Silver's. On redirect, she stated that she told the truth as best as she remembers.

Next, the defendant testified on his own behalf. He said that he is twenty-eight years old and that he and the victim have one child, Jacorey. He said that he and the victim broke up and got back together often. He acknowledged that he was seeing Andrea Vinson and the victim at the same time. He said that the day before she died, he and the victim ate lunch at Long John Silver's. He said the victim dropped their child off at 11:00 a.m. on the day of her death. He cut the child's hair, gave him a bath, and fed him. He then took the child to his grandmother's house and borrowed her van. He said that he went to get gas and to tell the victim he was going to take the child to Jackson.

When he arrived at the victim's apartment, Christie Ball let him in because the victim was in the bathroom. He said that the victim accused him of trying to bring the child back and that she told him to get the child's belongings. He went out and got the car seat and bag. He said she continued fussing at him and pushed him into the entertainment center. He said that she kicked the door and hit him in the leg. He said she threw her cellular phone at him, but it missed and went out the door. He retrieved the phone and looked through the numbers stored in it when he returned to his house. He said the victim came over to retrieve the phone. He said he began to walk down the street and, when he came close to the house, the victim arrived and they argued for a few more minutes. He then took the child into the house, and the victim drove away. He said he did not expect her to come back, but she returned in thirty to thirty-five minutes. He said that they began arguing and that she hit him in the head. He claimed that he pushed her into the dresser, where she grabbed a knife. They continued to scuffle, and the victim stabbed him in the arm. He said he then reached into the dresser and retrieved his handgun. He said the victim threatened to kill him, he got off the bed, and then pushed and shot the victim. He said that his intention was to shoot the victim but not to kill her. The defendant said he then walked out and told his uncle Marvin what had happened and told him to get the child. He said that he attempted to flag down a car but was unsuccessful and went back into the house, got the victim's keys, and drove her car to the police department. He threw the gun in the shrubbery and went inside. He claimed he was not trying to

hide the gun, but he was nervous. Once inside, he told an officer that "[his] baby's mother stabbed [him] and [he] shot her." An ambulance took the defendant to the hospital for treatment. He said that after his treatment, he was returned to the jail where he gave a statement to the police of what had happened. He said that the dresser drawer was not hard to pull out and that he did not close the drawer. He said he recalled that in the second interview, the questioning officer was trying to get him to admit that his arm was fully extended, but he refused. He said that he did not make threatening phone calls to the victim. Finally, he stated that it took eight stitches to close his stab wound.

During cross-examination, the defendant testified that he shot the victim. He said that the only wound he received was a stab wound to his upper left biceps. He indicated that the knife penetrated approximately one inch into his arm through a long-sleeved cotton shirt. He was treated and released from the Humboldt Hospital Emergency Room. He claimed that the victim swiped him across the face "like a mugging." He denied that mugging is a sign of disrespect in the African-American community. He said that he was able to open the drawer with one hand. He said that the victim called him a "mother f--ker" among other things and that she had the knife in her right hand and "mugged" him with her left. He said that she stabbed him after he pushed her away twice. He said that he did not think the victim would stab him. He also said that he told the police that he did not know where he shot the victim. He also could not explain how the drawer got closed. He did not call for help when the victim reached for the knife. Finally, he said that at the time of the incident he and the victim were still carrying on a physical relationship.

The State then recalled Lieutenant Baker for rebuttal testimony. On direct examination, he testified that the transcript to the defendant's second statement was substantially correct. He said that he did not notice any blood on the bed when he inspected the crime scene. On cross-examination, he said that he did not recall a previous instance where the tape of an interview was lost in a murder case.

Finally, the State called Sergeant Dennis Wright of the Humboldt Police Department. He said that he was present during Andrea Vinson's interview. He said that Ms. Vinson stated in the interview that the defendant kept his gun in a bag under the bed.

After deliberation, the jury returned a verdict of guilty for the charge of murder in the second degree. The court then set a sentencing hearing for December 20, 2004, at which time the court sentenced the defendant to serve twenty-years in the Department of Correction as a violent offender.

Analysis

On appeal, the defendant argues that: 1) the evidence was not sufficient to support the verdict of guilty of the offense of second degree murder and that the State failed to negate his theory of self-defense; 2) the court erred in failing to grant any relief for the loss of evidence by the State; and 3) he was sentenced improperly. We will analyze each issue individually as follows.

## I. Sufficiency

The defendant argues that the State failed to negate his theory of self-defense beyond a reasonable doubt. To support his theory, he relies upon the case of State v. Renner, 912 S.W.2d 701 (Tenn.1995), which discusses the "true man" doctrine where one need not retreat from the threatened attack of another even though one may safely do so. Id. at 703-04. The "true man" doctrine has been codified at Tennessee Code Annotated section 39-11-611 (2005). Here, the defendant mistakenly argues that the "true man" doctrine is applicable because he claims that he did not provoke the confrontation with the victim and further claims that he was in danger of bodily injury because he had been stabbed with a knife. Renner states that the "true man" doctrine is only applicable when the defendant is: 1) without fault in provoking the confrontation, 2) in a place where he has a lawful right to be, and 3) is there placed in a reasonably apparent danger of imminent bodily harm or death. Id. There is no dispute that the defendant was in a place where he had a lawful right to be. He was in his bedroom in his own home. However, we conclude that this is the only part of the test that he satisfies and that he is not entitled to application of the "true man" doctrine to justify his criminal responsibility.

There was an abundance of testimony to support that the defendant and victim had been engaged in heated arguments throughout the day of the incident. The defendant was unhappy that the victim had plans that evening, and he went as far as to renege on his agreement to watch their child in order to disrupt the victim's social activity. While he attempted to return the child to the victim, he stole her cellular phone, took a look at the numbers stored in the phone, and made calls to some of those numbers. Realizing that the defendant had taken her phone, the victim confronted him. The argument continued, and the parties separated. Then, upon realizing that the defendant had placed calls on her phone, the victim again approached the defendant, and the argument escalated. Because of his actions, we conclude that the defendant was responsible for provoking the confrontation. Only a person without fault may avail himself to the "true man" doctrine. Because he was at fault, the defendant cannot now claim justification for his actions.

The final prong of the test is that the defendant is placed in a reasonably apparent danger of imminent bodily harm or death. We conclude that the proof at trial demonstrated that the defendant was not in a position to fear injury or death at the time he shot and killed the victim. He claims that he was sitting on his bed when the victim grabbed a knife and stabbed his arm. However, the testimony revealed that there was no blood found on the bed to evidence a stabbing occurred there. Further, no fingerprints of the victim were found on the knife. While this is not conclusive evidence that the victim did not stab him, when viewed with the other evidence it is reasonable for the jury to determine that the victim was not responsible for the injury to the arm of the defendant.

This court does not reweigh or reevaluate the evidence in determining sufficiency. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). A jury verdict, once approved by the trial judge, accredits the State's witnesses and resolves all conflicts in favor of the State. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). Accordingly, the State is entitled to the strongest legitimate view of the evidence and all legitimate and reasonable inferences which may be drawn therefrom. Id. It

is our duty to affirm the conviction if the evidence, viewed under the appropriate standards, was sufficient for any rational trier of fact to have found the essential elements of the offense beyond a reasonable doubt.  See Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); State v. Elkins, 102 S.W.3d 578, 581 (Tenn. 2003).

Although the evidence of the defendant's guilt is circumstantial in nature, circumstantial evidence alone may be sufficient to support a conviction.  State v. Gregory, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993); State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987).  The circumstantial evidence, however, must exclude every other reasonable theory or hypothesis other than guilt.  Tharpe, 726 S.W.2d at 900.  In addition, "it must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that [the defendant] is the one who committed the crime."  Id. (citations omitted).

"Whether the 'true man' rule applies in a particular case is a matter to be determined by the jury.  The jury determines not only whether a confrontation has occurred, but also which person was the aggressor.  It also decides whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault."  Renner, 912 S.W.2d at 704. We conclude that because the jury found the defendant guilty of second degree murder, it rejected his theory of self-defense.  Because it is our duty to affirm the conviction if the evidence, viewed under the appropriate standards, was sufficient for any rational trier of fact to have found the essential elements of the offense beyond a reasonable doubt, we must affirm the judgment of the trial court in the instant case.  The jury rejected the defendant's theory of self-defense because they accredited the State's witnesses' testimony that discredited the defendant's theory.  There was no blood on the bed.  The victim was killed by a contact gunshot wound to the back of the head as she was attempting to exit the room and, presumably, the home.  Further, the defendant's credibility was attacked because it was pointed out that he lied to the police about the manner in which he shot the victim.  He told them that he shot her in the face though the autopsy revealed that the facial wound was an exit wound.  It is possible that the jury, quite simply, did not believe that the victim stabbed the defendant nor did she pose any threat to the defendant to justify a theory of self-defense.

We conclude that the State did negate the defendant's theory of self-defense and that the evidence was sufficient to establish the certainty of guilt of the accused.

## II.  Lost Evidence

The defendant argues that the trial court erred in allowing the State to introduce his second statement to police because the audio tape of the statement had been lost.  He suggests that the loss of the tape prevented him from receiving a fair trial.  Upon review of the trial transcript, it appears that the defendant failed to object to the introduction of this statement at trial and has thus waived his right to present this issue on appeal.  The failure to make an objection at trial results in a waiver on appeal.  Tenn. R. App. P. 36(a); State v. Thornton, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999); State v. Green, 947 S.W.2d 186, 188 (Tenn. Crim. App. 1997); State v. Little, 854 S.W.2d 643, 651

(Tenn. Crim. App. 1992). Because the defendant failed to object when the State moved to have his second statement admitted into evidence, he has waived appeal of this issue.

### III. Sentencing

"When reviewing sentencing issues . . . the appellate court shall conduct a de novo review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In conducting our review, we must consider the defendant's potential for rehabilitation, the trial and sentencing hearing evidence, the presentence report, the sentencing principles, sentencing alternative arguments, the nature and character of the offense, the enhancing and mitigating factors, and the defendant's statements. T.C.A. §§ 40-35-103(5), -210(b); Ashby, 823 S.W.2d at 169. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." Ashby, 823 S.W.2d at 169.

Here, the defendant argues that the mitigating factors that he submitted to the court should have been applied by the court. He correctly argues that the court did not rule which mitigating factors did or did not apply in this case because the trial court simply stated that "[t]he Court sees no reason that -- neither mitigating factor nor aggravating factor that would justify moving away from the presumptive sentence" and sentenced the defendant to twenty years in the penitentiary. The State argues that the submitted mitigating factors were not applicable.

The defendant submitted the following mitigating factors for the trial court's review prior to sentencing, codified at Tennessee Code Annotated section 40-35-113 (2005):

2)   The defendant acted under strong provocation;
3)   Substantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense;
11)  The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct; and
13) Any other factor consistent with the purposes of this chapter.

The weight assigned to enhancement and mitigating factors is generally left to the trial court's discretion. State v. Leggs, 955 S.W.2d 845, 848 (Tenn. Crim. App. 1997). The court did not specifically address any of the factors raised by the defendant, but it did make a blanket statement that no mitigating or enhancement factors would justify moving from the presumptive sentence. The trial court considered the mitigating factors and chose to give them little weight, if any. This is sufficient to satisfy the statutory requirement. We conclude that the trial court did not err in

determining that the mitigating factors submitted by the defendant are not applicable to modify the defendant's sentence.

<u>Conclusion</u>

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____

JOHN EVERETT WILLIAMS, JUDGE