IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 1, 2011

**STATE OF TENNESSEE v. LEONARD LAMONT CURRIE**

**Direct Appeal from the Circuit Court for Tipton County**
**No. 6477     Joe H. Walker, Judge**

**No. W2010-01702-CCA-R3-CD   -   Filed April 13, 2011**

The defendant, Leonard Lamont Currie, was convicted of voluntary manslaughter, a Class
C felony, and sentenced as a Range II, multiple offender to eight years in the Department of
Correction. On appeal, he argues that the evidence was insufficient to support the jury's
rejection of his claim of self-defense. Following our review, we affirm the judgment of the
trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JERRY L. SMITH and NORMA
MCGEE OGLE, JJ., joined.

David S. Stockton (on appeal and at trial); Parker Dixon and Lyle Jones (at trial), Assistant
Public Defenders, for the appellant, Leonard Lamont Currie.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; D.
Michael Dunavant, District Attorney General; and James Walter Freeland, Jr. and Billy G.
Burk, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

In November 2009, the Tipton County Grand Jury returned an indictment charging
the defendant with the second degree murder of his former girlfriend's boyfriend, Torrance
Peete. Following a jury trial in May 2010, he was convicted of the lesser-included offense
of voluntary manslaughter.

**State's Proof**

Latonya Evans testified that she and the defendant had a seven-year-old child. She acknowledged that, during their relationship, she and the defendant had violent disagreements, some of which resulted in her eyes being blackened and a knife being held at her throat. She admitted that she previously had created a disturbance at the defendant's residence and that the police made her leave. Evans said that she had been evicted from a previous residence because the defendant kicked in a door. At the time of the victim's death in July 2009, she was no longer involved with the defendant and was six months pregnant with the victim's child.

Evans said that, on the night of July 14, 2009, the victim was helping her move an air conditioner into her new residence when a car pulled up outside. Evans walked toward the car, realized the uninvited defendant was in it, and walked back toward her house. The defendant got out of the car and began cursing at her. The victim asked the defendant to leave, and the two started arguing. The defendant told the victim, "You ain't got shit to do with this. This my motherfucking baby mama." The victim replied, "That's my motherfucking baby mama. She asked you to leave." The defendant told the victim, "I whipped your ass once, and I'll whip your ass again." The victim responded, "Well, whip my ass then, right now," and the two started "doing the stuff like they was going to fight," but some of the defendant's family arrived and pulled him back. The victim then asked Evans to take him home, but she took him to her mother's house instead because she "wanted him to calm down." The victim later asked Evans' brother, Eric Davis, to take him home. Davis told the victim to wait, but the victim refused to do so and started walking, saying he was going home.

About forty-five minutes after the victim left, someone called Evans and told her that the victim and the defendant were arguing "over there in the Tatlock [Apartments]." As Evans was getting ready to leave, someone called her again, saying, "You need to hurry up and get over there. I don't know what happened. . . . [The victim] is over there and he laid down, and I think [the defendant] just stabbed [the victim]." When Evans arrived at the scene, she saw the victim "laying there, and [saw] blood and everything."

Officer Gary Hatcher of the Covington Police Department testified that he was called to the Tatlock Apartments at approximately 11:16 p.m. on July 14, 2009. When he arrived, he observed the victim lying facedown in a pool of blood on the parking lot. The defendant walked out of an apartment and told Officer Hatcher, "Yeah, I did it. I did it. I killed the motherfucker." He took the defendant into custody and, during a pat-down, discovered a knife handle in the defendant's left pocket. Officer Hatcher found the knife's missing blade on the ground approximately seven to eight feet from the victim's body. He did not notice

any injuries on the defendant's person. Officer Hatcher observed blood spatter on the driver's side of a blue vehicle parked on the east side of the apartment building. A white, four-door vehicle was parked near the doorway of the defendant's apartment. Officer Hatcher estimated that the two vehicles were about seventeen to twenty feet apart and were not pointed in the same direction.

Nakia Jackson testified that she had known the victim for over six years and that on the night of July 14, 2009, she picked him up in her white, two-door Trans Am. They subsequently drove to the Tatlock Apartments, which they frequented on a regular basis because some of the victim's family lived there. When they were about two doors down from the defendant's apartment, the defendant came running outside. While the car was still rolling and near the apartment next-door to the defendant's, the victim jumped out of the car. The defendant and the victim "met up face to face" and started arguing "about what happened before." The defendant pulled up his shirt and told the victim, "I ain't got no gun. I ain't got no knife. . . . Why is you at my house?" The victim told the defendant, "[W]hat's up with all this shit . . . the bull shit you been doing . . . . I'm coming to you like a man. Fight me." The defendant then went inside, and the victim turned to get in the car to leave. The defendant ran back out of the house with a butcher knife behind his back and "got in [the victim's] face," saying, "What's up, bitch? . . . I'm fixing to call the police on you." The victim asked the defendant to step to the side and pulled up his pants to "square off to fight." The defendant "passed the first lick," and the defendant and the victim tussled toward the garbage dumpster. Jackson then heard the defendant call for his teenaged son to "come here." Jackson told the defendant's son that the fight had nothing to do with him. She related what happened next: "[The victim] broke to run out from Tatlock or whatever, but he bust a U running towards the car, calling my name. I done made a couple of steps going towards him, and he fell to my feet. He was dead."

Dr. Lisa Funte, a medical examiner at the Shelby County Regional Forensic Center, testified that she performed the autopsy on the victim and determined that the cause of death was a stab wound to the neck. She said that the victim's height on the autopsy table was 6'1" and his weight was 235 pounds. Dr. Funte said that the trajectory of the victim's stab wound was "from the left side of the neck toward the right side, downward, and slightly front to back," but she was unable to determine whether the wound was inflicted from the front or the back. The depth of the wound was five and one-quarter inches. The victim had a fresh abrasion on the back of his right shoulder, a laceration on one of his wrists, and abrasions on his knees, arms, and hands. A toxicology report on the victim revealed an alcohol level of .04% in the postmortem blood specimen.

**Defendant's Proof**

David Weathers testified that he knew both the defendant and the victim. He described the victim as "a big guy" and "a beast." He recalled past occasions when the victim was drinking and became angry "over females."

Candice Fleming, the defendant's girlfriend, testified she was living with the defendant in the Tatlock Apartments on July 14, 2009. That night, the victim and "a young lady" came to the apartments, and the defendant told Fleming to call the police and went outside. Fleming heard arguing, looked out the window, and saw the victim hit the defendant. She looked for her cell phone to call the police but could not find it. The defendant called the police, using Xavier Peat's phone. After the police arrived, Fleming stepped outside and saw the victim on the ground.

Travis Smith testified that he had known both the defendant and the victim all his life. He said that he had told the defendant about an incident he had with the victim when the victim discovered that he was talking to the victim's girlfriend. Smith said that the victim was angry but "never did put his hands on [him]."

The defendant elected not to testify.

## ANALYSIS

The defendant argues that the evidence was insufficient to support his conviction for voluntary manslaughter and the jury's rejection of his claim of self-defense.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). At the time of the offense, the self-defense statute provided:

A person is justified in threatening or using force against another person when, and to the degree, the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

Tenn. Code Ann. § 39-11-611(a) (2006). A person is not justified in threatening or using force against another person if that person provoked the other's use or attempted use of unlawful force, unless the original provoker abandons the encounter or clearly communicates his intent to abandon the encounter and the other person nevertheless continues or attempts to use unlawful force. Id. § 39-11-611(d)(1).

When the defense of self-defense is fairly raised by the evidence, the State carries the burden of proof to negate the defense beyond a reasonable doubt. See id. § 39-11-201(a)(3); State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996). However, whether a defendant acted in self-defense is a question of fact for the jury to determine. See State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). "Encompassed within that determination is whether the

defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault." State v. Thomas Eugene Lester, No. 03C01-9702-CR-00069, 1998 WL 334394, at *2 (Tenn. Crim. App. June 25, 1998), perm. to appeal denied (Tenn. Feb. 1, 1999) (citing State v. Renner, 912 S.W.2d 701, 704 (Tenn. 1995)). It is within the prerogative of the jury to reject a claim of self-defense. See Goode, 956 S.W.2d at 527.

The defendant argues that because the confrontation occurred immediately outside the front door of his residence, within the curtilage surrounding it, he had a reasonable belief of imminent death or serious bodily injury. "Curtilage" is defined as "the area surrounding a dwelling that is necessary, convenient and habitually used for family purposes and for those activities associated with the sanctity of a person's home." Tenn. Code Ann. § 39-11-611(a)(2) (2010).

Viewed in the light most favorable to the State, the proof at trial established that the defendant went, uninvited, to the new residence of his former girlfriend where he and the victim argued and he told the victim, "I whipped your ass once, and I'll whip your ass again." Later that same evening, the victim went to the defendant's apartment complex where they argued again, and as the victim was getting in the car to leave, the defendant, armed with a butcher knife, stabbed and killed the victim. By finding the defendant guilty of the lesser-included offense of voluntary manslaughter, the jury obviously determined that the defendant acted in a state of passion produced by adequate provocation but rejected his claim that he killed the victim in self-defense. It is not the province of this court to second-guess factual determinations made by the jury. Therefore, we conclude that the evidence was sufficient to convict the defendant of voluntary manslaughter.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgment of the trial court is affirmed.

_____
ALAN E. GLENN, JUDGE