# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON

### Assigned on Briefs at Knoxville February 25, 2014

## STATE OF TENNESSEE v. KEVIN HOLST

**Appeal from the Criminal Court for Shelby County**
**No. 11-05648      James C. Beasley, Jr., Judge**

_____

**No.  W2013-00846-CCA-R3-CD  - Filed May 29, 2014**

_____

The Defendant, Kevin Holst, was convicted by a Shelby County Criminal Court jury of aggravated assault, a Class C felony.  *See* T.C.A. § 39-13-102 (2010).  The trial court sentenced him as a Range III, persistent offender to twelve years' confinement.  On appeal, he contends that (1) the evidence is insufficient to support his conviction and (2) the court erred by refusing to send the exhibits to the jury room during deliberations.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Stephen C. Bush, District Public Defender; Harry E. Sayle, III (on appeal), and Lawrence R. White (at trial), Assistant Public Defenders, for the appellant, Kevin Holst.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Amy P. Weirich, District Attorney General; and Stacy McEndree and Jose F. Leon, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case relates to the stabbing of Joe Barber.  At the trial, the victim testified that he was forty-eight years old.  He said that on the night of December 21, 2010, the Defendant stabbed him four times.  He said he was homeless at the time of the incident but was staying at the Memphis Union Mission.  He admitted he was previously convicted of robbery and received a four-year sentence.

The victim testified that on the night of the incident, he was with Charles Pigram at the bus stop on the corner of Poplar Avenue and Manassas Street and that the Defendant and an unknown man were there. He said that he had known the Defendant eight or nine years and that they met when they previously worked together. He said that they had been drinking, that the Defendant accused him of stealing "crack," that the argument began as pushing and shoving, and that the Defendant grabbed a knife and stabbed him in the stomach, chest, armpit, and side. He said he was probably stabbed with a knife that was about four inches long. He only saw the knife after the Defendant pulled it from his jacket or his pocket. He denied he attacked the Defendant or had a box cutter that night. He recalled trying to get away after he was stabbed twice and said the Defendant walked away but returned and stabbed him twice more. He said he was able to reach the Citgo gas station before he collapsed.

The victim testified that he awoke in a hospital on some day in January but could not remember the date. He said that he spoke to the police after he awoke, that an officer showed him a photograph lineup, and that he identified the Defendant as the person who stabbed him. He identified the clothing he wore on the night he was stabbed. He identified a map of Poplar Avenue and Manassas Street, which showed the corner where the bus stop was located and the incident occurred. He used the map to explain to the jury where the argument began, where he was stabbed the first two times, where he was stabbed the second two times, and where the gas station was located.

The victim testified that when the Defendant returned to stab him again, Mr. Pigram tried to intervene and that the Defendant said, "You'd better get him out of my way before I kill him." He said that since he was stabbed, one of his hands did not warm quickly after exposure to cold weather. He said the doctor told him that a nerve under his arm was damaged. He identified a "Bible tract," which he said he received at the mission and kept in his pocket. He said that at the time of the trial, he lived at a halfway house for people with drug and alcohol addiction and that he was in recovery. He said he had been "clean" for about fifteen months.

On cross-examination, the victim testified that the argument began in front of the bus stop and carried into the street when he tried to leave. He said he left the bus stop and began walking toward the business across the street. He said he gave a statement to the police when he was released from the hospital in January. Although he said he was unconscious from the night of the incident until he awoke in January, he agreed that he told the police he was in a coma for three or four days, which meant he awoke by Christmas. He said he was unconscious three or four days.

-2-

The victim agreed he was smoking crack and drinking vodka heavily on the night he was stabbed. He said he slept at the mission the night before the incident, awoke at 5:30 a.m., and started drinking and doing drugs around 6:00 p.m. He said the incident occurred around 12:00 a.m. He said he consumed two pints of vodka between 6:00 p.m. and the time of the incident. When asked how much crack he had consumed that night, he said that it "varie[d]" but that Mr. Pigram would know better because he bought it. He thought Mr. Pigram made two "runs" and purchased a $15 crack rock on the first run and a second one an hour or two later. When asked if he told the police that Mr. Pigram bought crack that night, he denied the police asked him about it. He remembered admitting to the police that he smoked crack. When asked what his response was when the police asked where he obtained the crack, he said he told them "Kevin" and did not tell them that Mr. Pigram bought him crack. He said he told the police that he did not buy the crack from Kevin but that Kevin gave it to him. He denied he told the police that he and Mr. Pigram consumed crack all night. He denied that he smoked marijuana or took pills that night but said he consumed vodka and crack. He said that the Defendant gave him crack and that he smoked it.

The victim testified that he had known the Defendant for a while and agreed he helped the Defendant obtain a job. He agreed that when the Defendant was married, the Defendant allowed him to spend two or three nights at his house when he needed a place to stay. He said that after the Defendant smoked crack, the Defendant became mad and accused him of stealing crack earlier that day.

The victim testified that he did not always sleep at the mission because they only allowed him to stay four nights per month and that some nights he had to sleep where he found shelter. He agreed that he had slept outside and that it was dangerous but denied that he carried a knife or a box cutter. He denied that the Defendant approached him and Mr. Pigram at the bus stop, told them he was trying to obtain money to go to the mission and had Percocets, pulled out the pill bottle to show them, and offered to sell them a couple of pills for $5. He denied that he grabbed the pills from the Defendant, shoved him to the ground, pulled out a box cutter, pulled the Defendant's jacket over his head, and attempted to cut his chest and that he was stabbed in the process.

The victim testified that he was staying in a recovery house for drug addicts at the time of the trial. He admitted that he was intoxicated and high on drugs on the night of the incident and that he gave his statement in January after being released from the hospital but said he knew what happened. When asked how much crack he smoked with the Defendant, he said the Defendant gave him a "BB," which was a crack rock the size of a BB for a BB gun. He said the size of a $15 crack rock depended on the person from whom it was purchased. He said Mr. Pigram bought the crack and would not give him the majority of it.

-4-

He admitted having his own crack pipe. He said that Mr. Pigram handed him the crack and that he loaded his own pipe once from each of Mr. Pigram's $15 rocks. He clarified that his pipe was not really loaded and that it took a lot of crack to load a crack pipe. He said the effects of crack wore off quickly and would not last all night. He agreed the effects of alcohol lasted longer.

Charles Pigram testified that he was forty-eight years old and had a criminal impersonation conviction and ten misdemeanor theft convictions. He said that on December 21, 2010, he was with the victim at the Memphis Union Mission because he was homeless. He said that right before dark, he and the victim were by the store drinking and decided to walk. He said that he walked down Alabama Avenue, that the victim walked down Poplar Avenue, and that they met a few minutes later. He said that they met with the Defendant and another man who was with the Defendant, that they were still drinking, and that they all went to sit at the bus stop. He said that the Defendant went to the liquor store and that they were sitting, drinking, and having a good time.

Mr. Pigram testified that the Defendant obtained crack and gave the victim a piece but that the Defendant became mad and "snatched" the crack back. He said that the victim had a crack pipe and that the Defendant grabbed the pipe, threw it on the concrete, and broke it, which made the victim mad. He said that the victim asked the Defendant why he broke the pipe and why he snatched the "dope" and that the Defendant responded it was none of the victim's business, to get out of his way, and to stop "grabbing on" him before the Defendant did something to him. He stated that he grabbed the victim and said, "Come on, man. Let's go. . . . we all been drinking . . . It might lead to something else." He said the victim responded, "No, I'm going to handle this. This man done took something of mine. You know, he done broke something of mine." He said the Defendant removed his jacket and backpack and told the victim that if he grabbed him again, they were "going at it." He said that the victim continued to grab the Defendant and that they began wrestling and "tussling." He said that the Defendant kept swinging at the victim, that the two moved into the middle of the street, and that the Defendant swung at the victim five or six times. He said that when the Defendant finished and went back toward the bus stop, the victim began feeling weak and told him "this man done cut me."

Mr. Pigram testified that he did not see a knife. He said that the Defendant attempted to return to the victim and that he told the Defendant to leave the victim alone because the victim was already bleeding and he was trying to get him to safety. He stated the Defendant said, "That's right. You better go ahead, and both of y'all get out the way before I kill both of y'all." He said that the victim passed out before they reached the other side of the street and that someone in the Citgo called the paramedics and the police. He said that he saw the "blade part" but not the "whole thing" in the Defendant's hand when the Defendant returned

-5-

the second time. He denied seeing the victim with a knife or a box cutter. He said they smoked crack "off and on" that night. He said he was with the victim when the police and the paramedics arrived. He said that he smacked the victim's face and told him, "Don't die on me," but that the victim could not respond and passed out.

Mr. Pigram testified that a detective took him downtown that night, that he made a statement, and that he identified the Defendant in a photograph lineup. He said he met the Defendant at the mission in February 2009. He said that the victim had blood all over his shirt, pants, and shoes and that blood was all over the streets and the Citgo parking lot. He said the Defendant returned the knife to his pocket before saying he would kill them both. He said that four men were at the bus stop but that other young men were at the Citgo and the store across the street. He said that he saw the victim's injuries, that the victim was bleeding from the chest and the stomach, and that he was bloody.

On cross-examination, Mr. Pigram testified that he bought crack twice for him and the victim on the night of the incident. He said that he did not know what time he met the victim but that it was dark. He said that before they met with the Defendant, they smoked crack, that he and the victim drank about a pint of vodka, and that they each probably drank two twenty-four-ounce beers. He admitted he was convicted of theft of property in 2007, 2008, and 2011. He said he and the victim met that night at the "African store" across from the mission and began drinking. He denied that the victim went with him to buy crack and said that he went to Jones Street and bought a "dime" of crack, which he explained was ten dollars' worth and was the size of his little fingernail. He said he and the victim split the crack and smoked it from a glass pipe. He said that for $10, they could each "hit it" about one time and that the high would last about ten or fifteen minutes.

Mr. Pigram thought it was about 6:00 p.m. when he met the victim because it had just become dark. He guessed the incident occurred around 11:00 p.m. or 12:00 a.m. and said it was closer to midnight, although he did not have a watch.

Mr. Pigram agreed that he and the victim met and drank a little, that they walked and met the Defendant on Manassas Street, and that he and the victim went to a liquor store. He did not know where the Defendant got the crack but knew he had it in his hands. He said that an unknown person was with the Defendant and that he thought the person was a woman. He agreed his police statement said the person was the Defendant's "lady friend." He said that he thought the person was female because of the way she talked but that after the victim was released from the hospital, the victim told him the person was a male. He said he did not know whether the person was a man or a woman.

Mr. Pigram testified that he drank two pints of vodka and a twenty-four ounce beer and smoked crack about twice that night. He said the Defendant gave the victim crack and became angry. He said that he did not know what the Defendant "got snappy about" but that the Defendant snatched the crack and the crack pipe and threw the pipe on the sidewalk, cracking it. He said the victim was mad at the Defendant, asked why the Defendant did it, told the Defendant he owed him, and kept pulling on the Defendant's jacket, although he was not violent. He said that they were all drinking and that he tried to get the victim to leave, pulled him back, and told him to "leave it alone." He said that the Defendant was trying to leave and was walking away from the victim but that the victim kept going after the Defendant and grabbing his jacket but not threatening him. Although he did not know the Defendant's exact words, he thought the Defendant stated, "You grab me one more time and I'm going to do something to you." He said the victim told him to let him handle his business because the Defendant took something of his. He said he was trying to hold back the victim because he knew the Defendant did not like anyone grabbing him.

Mr. Pigram remembered describing the Defendant to the police as a "real skinny guy" and agreed he and the victim were bigger than the Defendant. He did not remember telling the police how much the victim weighed but said he thought the victim was "medium built." After reviewing his statement to the police, he agreed he told the police that the victim was between 210 and 220 pounds.

Mr. Pigram testified that at the time of the incident, he was homeless and sometimes stayed at the Union Mission. He agreed that some nights he was not permitted in the mission and stayed on the streets, which was dangerous, that it was common to carry a knife or a weapon for protection, and that he sometimes had a knife for protection. He denied ever seeing the victim with a knife.

Mr. Pigram did not remember if the Defendant told him and the victim that he needed money to get into the mission when he tried to sell them Percocets but remembered telling the police that the person with the Defendant asked them what they wanted to do about the Percocets. He denied the Defendant was alone that night when he approached them. He remembered seeing the Defendant with pills but did not remember the victim's grabbing the pills and pushing the Defendant when the Defendant showed them the pills. He did not remember the victim's pulling the Defendant's coat over his head after pushing him down and denied seeing the victim with a box cutter. He agreed he was about ten or fifteen feet away when the stabbing occurred. He said that he tried to pull the victim away from the Defendant at first and that when the Defendant removed his jacket after the victim approached, he told the victim that he had made the Defendant mad and that they needed to go. He said that the victim and the Defendant began "tussling" and that he thought the issue was finished but that the Defendant "came back at" the victim. He said that they began

-6-

tussling in the street, that the Defendant left, and that the victim stated, "This man done cut me."

Mr. Pigram testified that the group was behind the bus stop when the Defendant tried to leave and walked toward the basketball court. He said that when the tussling began, they moved into the street and that he pulled the victim to the bus stop after the Defendant left. He said the Defendant returned, came behind the victim's back, and told them to get away before he killed them. He stated that he took the victim across the street, that the victim became weak and passed out in front of the gas station, and that he did not see the Defendant when he looked back.

Mr. Pigram agreed he was not concerned about the victim's being able to take care of himself because the victim was heavier than the Defendant. He said he did not stop the fight because he did not think it was serious until he saw the blood and thought the Defendant and the victim were playing based on their friendship. He said he realized it was serious when the victim told him that the Defendant had cut him.

After he reviewed his statement to the police, Mr. Pigram remembered telling the police about the woman who was with the Defendant that night and about being offered pills for sale. He agreed that he was convicted of theft of property on August 18, 2006, March 29, 2006, March 23, 2004, and March 22, 2004, and that he was convicted of criminal impersonation on August 20, 2002. He said that he drank one beer before he met the victim and drank another beer and a pint of vodka with the victim and that the Defendant bought another pint of vodka that four of them split. He said he did not smoke crack with the Defendant or see the victim smoke with the Defendant.

Mr. Pigram did not remember telling the police he bought crack but said he mentioned a girl when he spoke to them. He agreed he was referring to a prostitute when he said he was looking for a girl to have some fun but said he did not find one. He thought the person with the Defendant was a woman because she wore a wig and talked "real light" but said he only told the police the person was female without describing the woman. He said that after he had given his statement to the police, the victim was released from the hospital and told him the person was a "guy."

Mr. Pigram testified that after the victim told him he could handle the situation, he let him go and stood back to watch what happened. He thought the Defendant would walk away, but the Defendant removed his jacket and walked toward the victim. He thought they were joking because they were friends. He agreed that the Defendant and the victim were about three or four feet apart when the Defendant removed his jacket and that he was about

ten or fifteen feet away. He agreed that the victim was the one who first "laid hands" on the Defendant after the crack pipe was broken and that the victim pursued the Defendant.

On redirect examination, Mr. Pigram testified that he saw the victim the day before his testimony and that he looked about the same as he did at the time of the incident and did not weigh 240 pounds. He agreed he had known the victim his entire life and did not think he had a karate black belt. He said that after they drank the pint of vodka, the Defendant placed a piece of crack in the victim's hand. He said he saw the knife the second time the Defendant approached the victim. He said that after the victim was stabbed, the victim's back was toward the Defendant when the Defendant approached the victim again. He said that he remembered the person with the Defendant asking what they would do with the pills, pouring the pills into the Defendant's hand, and asking if they wanted to "get some dope." He did not remember the Defendant's leaving and getting crack but said that when he turned, the Defendant had crack in his hand. He denied that he had a box cutter or a knife that night and said that he did not see the victim or the person with the Defendant with a box cutter.

Memphis Police Officer Rex Shipley testified that he responded to a call about a fight on the corner of Poplar Avenue and Manassas Street on December 22, 2010. He said that after he arrived at the scene, he saw a lot of blood on the sidewalk from the front of a store on Poplar Avenue to the sign for a neighboring restaurant, which was where he found the victim. He said the victim was covered in blood and barely coherent. He said that after the scene was secure, an ambulance arrived and that the paramedics worked on the victim.

Officer Shipley testified that the evidence was secured until a crime scene investigator arrived, that he, other officers, and a sergeant from Felony Response searched for evidence in Morris Park, surrounding gutters, and the streets, and that no knife or box cutter was found. He said the victim's clothes were removed at the scene. He said that he did not know the extent of the victim's bleeding until the paramedics removed his shirt.

Officer Shipley testified that he received the call between 12:00 and 1:00 a.m. and that he spent more than half his shift collecting information for his report and searching for evidence. He said he spoke to one witness named Charles but could not remember the witness's last name. He said that they knew the first name of a suspect at the time of the call but that the caller could not state a last name. He said that he was the first officer at the scene and that he arrived within two to three minutes of the call.

On cross-examination, Officer Shipley denied that many people were in the area and said it was cold. He did not see anyone in the park. He said that street lights were on both sides of Poplar Avenue, that the park was illuminated only by the surrounding street lights,

and that the officers used flashlights to search. He said that in order to clear the scene for the ambulance, he stayed close to the victim, scanned the area, and saw no one.

On redirect examination, Officer Shipley testified that the search of the park was very thorough. He said he looked in several trash cans, removed the bags, and looked through food wrappers and liquor bottles. On further cross-examination, he denied that his search went past the park toward downtown and said the search was concentrated in the park and the surrounding streets.

Memphis Fire Department Firefighter and Paramedic Chris Horvath testified that he was a firefighter and EMT in December 2010 and that he responded to a call around Poplar Avenue and Manassas Street for "[m]ultiple stabbings, man down." He said that when he arrived at the scene, a man wearing a heavy jacket was lying on the ground with one noticeable stab wound. He said he removed the victim's jacket, cut off his shirt, found multiple stab wounds, and checked the victim's body for other wounds. He thought he found about five stab wounds, including wounds in the victim's left side, armpit, back, and close to his pelvis near his abdomen.

Mr. Horvath testified that when he arrived, the victim was fully dressed and that his procedure was to get a patient undressed to check for other wounds, uncontrolled bleeding, breathing, and circulation. He said that if he cut off a victim's clothes, he usually left them at the scene for "Crime Scene" and that he tried not to cut through the holes if it was a shooting or stabbing to preserve the evidence. He said the fire department only took with them what the victim was wearing, not any other evidence. He knew the victim did not leave the scene with his shirt and thought the victim was not wearing his pants. He remembered leaving the victim's jacket and shirt at the scene. He said that the fire department did not have a "security procedure" but that he searched for weapons as he assessed the patient. He said that if he found a weapon, he set it aside for the police department to secure.

Mr. Horvath testified that the victim was an African-American male in his late thirties or early forties and was between 5'8" and 6'0". He said that he arrived at the scene a couple of minutes after the call was received and that Officer Shipley was there when he arrived. He said they approached the scene after the police department secured it. He did not recall removing a weapon, sharp objects, or a box cutter from the victim. He said the victim's wounds were consistent with stab wounds from a knife. He said he treated the victim at the scene, placed him in the ambulance, performed quick life-saving measures, and transported him to the hospital.

On cross-examination, Mr. Horvath testified that he did not search the victim's pockets when he cut off his pants, that he was not a police officer, and that he was trying to

remove the pants to search for other wounds. He said it was possible he did not notice something in the victim's pockets. On redirect examination, Mr. Horvath testified that he did not feel anything sharp. He said that if he had felt something sharp, he would have alerted the police officers and removed the pants because he did not want to be cut or stabbed.

Memphis Police Crime Scene Officer Lee Walker testified that the Crime Scene Division's role was to collect and preserve evidence for future prosecutions. He said that he responded to the scene, that the scene was secured when he arrived, and that crime scene tape was up to prevent people from entering or leaving without checking with the officer taking roll. He found bloody clothes, liquor bottles, and bags at the scene. He said he collected anything that investigators wanted him to tag and items he found and considered possible evidence. He said that most of the time, he collected evidence from inside the taped-off crime scene, although he could extend the area if he deemed it necessary.

Officer Walker testified that he spent at least three to four hours at the crime scene because it was large and that any time there was a "critical," he had to take measurements and create a sketch, which took time. He said he had to collect evidence at the scene, change locations to the hospital, collect evidence there, change locations to "201 Poplar," tag the evidence, and remove the evidence soiled with blood to hang to dry in the Crime Scene office. He said it may have taken longer than four hours. He said he knew he was finished after he collected all the evidence, spoke with the on-scene investigators to determine nothing needed to be reviewed, and performed a walk-through. He did not recall leaving behind evidence or property. He denied tagging a knife or a box cutter in the evidence he identified with placards or in the evidence he collected at the hospital.

On cross-examination, Officer Walker testified that he did not see a crack pipe in the photographs of the scene. He agreed that if the victim's crack pipe had been at the scene, he would have photographed it and said that if the pipe was in the victim's pocket, he would have found it when he searched them in the property and evidence room, documented it, and placed it with the victim's personal belongings. He said that he searched the immediate area of the park, not the entire park, because it was a large park and that other officers canvassed the entire park before he arrived.

Officer Walker testified that he collected some of the victim's clothes from the hospital, that they were given to him in a plastic bag by the nurses, and that he inventoried the clothes at the time they were given to him and again in the property room. He said he searched the pants pockets in the property and evidence room but not at the hospital.

Memphis Police Officer Nathan Burford testified that he investigated the stabbing. He said that on the morning after the incident, he read the report from the aggravated assault in the park and contacted the Felony Assault Unit. He said he received the name and a photograph of the suspect, whom he identified as the Defendant. He said he located the Defendant at the Union Mission in the middle of the day on the day after the incident. He did not recall if he saw stab wounds on the Defendant and denied seeing bleeding, holes, bruises, face cuts, a broken nose, or evidence that the Defendant had been beaten.

Officer Burford testified that the Defendant did not make any statements to him. He agreed he "pat[ted] down" the Defendant but denied finding anything threatening. He could not recall the time of day and only remembered that it was daylight. He said the Defendant had a backpack. On cross-examination, Officer Burford said that the Defendant did not give him any problems when he confronted him and took him into custody.

Patricia Hart, an employee of Aramark Correctional Services, testified on behalf of the Defendant that when an inmate was "housed," he wore an inmate uniform and that his clothes were taken, inventoried, registered in the system, and placed in a bag for storage. She said the Defendant's property report listed the items received from the Defendant on December 22, 2010, by Swanson Services, the company that preceded Aramark's contract, and included a black jacket with a hood. She identified a jacket from the property room as the Defendant's.

The Defendant testified that he stabbed the victim but that he did not attempt to kill him. He said he pulled out a knife because the victim was attacking him. He said he had known the victim about twelve years. He said that he was homeless at the time of the incident and that he stayed at the Memphis Union Mission. He said that on December 21, 2010, he was at Nancy Wright's house near Manassas Street for a couple of hours but that he did not stay with her because he was one of her "friends on the side" and she was seeing someone else. He said that when he left, he walked toward Poplar Avenue and Manassas Street to go to the mission and that the mission only admitted people late if they paid six dollars, which he did not have.

The Defendant testified that he heard someone calling his name as he approached the corner of Poplar Avenue and Manassas Street and that although it was late and dark, he saw it was the victim and the victim's friend. He said that he knew the victim's friend as "Red," that he did not know him as Charles Pigram at the time, and that he had known Mr. Pigram two or two and one-half years. He said that the victim asked him what was happening and that he told the victim he was going to the mission, although he did not have the money. He said that the victim asked what he was going to do and that he told the victim he thought about selling his Percocet pills, which were prescribed to him after he fractured his jaw when

-11-

he was hit in the face with a baseball playing "hot ball." He said that the victim had a few dollars and agreed to help him and that he reached into his pocket and pulled out a few pills to show the victim. He said the victim took the pills and put them in his mouth. He said to the victim, "S---, man, what's going on? . . . That's the game you playing now?" The victim answered, "Oh, man, live with that." He said that he saw the victim's crack pipe on the park bench at the bus stop and that he decided to break the victim's pipe to make them even. He said he was alone and denied a fourth person was there.

The Defendant identified his coat and said he last saw it two days before Christmas in 2010 when he wore it at the corner of Poplar Avenue and Manassas Street but said he was wearing it when he was arrested. He said he had the coat four or five months before the incident. He said that the "cut" on the front right side of the coat near the zipper happened when the victim grabbed him and pulled his hood over his head. He said he noticed the victim had an open box cutter in his hand before the victim grabbed him. He agreed the coat was "ripped" during the incident.

The Defendant testified that he said, "This is even Steven," and walked toward the mission but that the victim grabbed him. He said he weighed 128 pounds when he was arrested. He said that the victim spun him around and pushed him to the ground, that he was on his back and tried to move away from the victim, and that the victim continued approaching. He said he saw the victim had a box cutter in his hand and knew he could not let the victim grab him because the victim was bigger than he. He said that he was on the sidewalk where the bus stopped at the corner of Poplar Avenue and Manassas Street but that he did not know where the victim's friend was. He said that he stood when he realized he could not back away from the victim fast enough and that the victim grabbed his hood from the back and pulled it over his head, which prevented his seeing. He said he did not know the victim's intentions but knew the victim had a box cutter. He said he had fractured his jaw the previous month and could not let the victim hit him. He said that he did not know if the victim was circling him, preparing to grab him, or planning to attack him with the victim's friend, that he knew if they grabbed him it was over, and that he was scared. He stated that he reached into his pocket and grabbed his two- to three-inch knife and that his hood was still over his head preventing his seeing. He said he was still being beaten and thought he had to do something. He said he removed the knife from his pocket and opened it but could not see and did not know what he was doing. He said he was "just swinging wildly" and wanted the victim to let him go. He said that after he realized the victim's grip was gone, he "got his coat together and put everything back on" but that he did not see the victim's friend and looked around to ensure the friend could not grab him. He said that once he had himself together, he arranged his hood on his head to be able to see and left the park to get as far away from the victim as possible.

The Defendant testified that he had no intention of hurting the victim and did not know the victim was hurt. He said he only wanted to get the victim off him. He said that he and the victim were friends and that he had no reason to fear the victim. He denied he expected the incident to occur and said his intent was to "get some kind of security." He said that the victim had a larger weapon than his "little piece of a knife," that he did not intend on hitting the victim, and that he only wanted the victim to let him go. He demonstrated for the jury his position when the victim kept coming toward him.

The Defendant testified that a matter of seconds elapsed between the victim's pushing him to the ground and releasing his grip on him. He said it was very quick. He said that he had no idea if he stabbed the victim twice, left, and returned to stab him two more times and that he was unaware he had stabbed the victim at all. He said that he heard the victim testify about his giving the victim crack, grabbing it back, and attacking the victim but that it did not happen. He agreed he was convicted of misdemeanor theft in 2004. He said that he did not intend to murder the victim and that the victim attacked him with a weapon.

On cross-examination, the Defendant testified that he graduated high school. He said that after he and his fianceé separated a few years previously, he decided to go to the mission to try to get himself together before he went home to his mother, father, sister, and aunts. He said that he carried a knife because living on the streets was dangerous.

The Defendant remembered the night of the incident but did not remember stabbing the victim twice and returning to stab him twice more. He said that when he hit the victim, he had no idea he was hitting him with the knife. He said that the knife was in his hand but that it was small and was the size of the prosecutor's "baby finger." He said he was in the courtroom when the victim showed his injuries but denied seeing the victim's scars. He said he learned the victim was in a coma for three weeks when the victim testified at the trial. He said that his knife was not big, that an ink pen or a stapler could send someone to the hospital, and that he was unaware the victim went to the hospital for stab wounds. He said that he did not know how many times the victim was stabbed and that he did not know the victim was stabbed at all. He said he was scared for his life and swung the knife wildly.

The Defendant testified that the pills he had were prescribed by his doctor. He said that he was trying to sell one of the pills to get into the mission and admitted that he knew selling pills was illegal. He denied smoking crack or drinking with the victim that night. He said that he had nothing to do with the Dark Eyes Vodka bottles found and that he did not drink Dark Eyes Vodka, only Seagram's Gin. He said the victim "pretty much" looked the same at the trial as he did on the night of the incident and was "pretty much" the same height and weight.

The Defendant testified that he dropped his knife when he left the park because he was trying to run. He denied knowing where he dropped it and said he was scared. He said he did not "come at" the victim a second time. Although he denied selling pills, he also said he sold pills only that night. He denied he ran because he stabbed the victim and said he was scared and tried to get away. He said he did not see the victim collapse and did not know the victim collapsed. He did not remember telling the victim he would kill him or telling Mr. Pigram, "Get out of my way or I'm going to kill you, too."

The Defendant testified that the victim's crack pipe was on the park bench, not with the victim. He said he knew it was the victim's crack pipe because the victim always carried one. He said he had testified that he did not smoke crack that night, not that he did not smoke crack at all. He admitted he was convicted of misdemeanor theft of property. When asked to describe the box cutter the victim had, he said that it was "not really describable," that he just noticed the victim had one, and that he knew what a box cutter looked like because he had seen many. He said the victim's box cutter was hand-held, opened, and similar to the one he used to open boxes when he worked in a grocery store. He denied that he could describe how long the box cutter was and said that it was dark and late and that there was no way to determine the color or if it was rusty.

The Defendant testified that the victim held the box cutter in his right hand. He said the cut in his jacket was made by the victim with his box cutter during their altercation. He denied he and the victim were only close to each other when he was backing away from the victim on the ground. He said they were close to each other the first time when the victim grabbed him to turn him around, a second time when the victim pushed him to the ground, a third time when he was on the ground backing away as the victim approached him, and a fourth time when the victim approached him as he was trying to stand. He denied his jacket was cut during the first three encounters and said it was cut when the victim swung with one hand and grabbed his hood with the other as he tried to stand. He said that he pulled his knife from his right pocket as the victim threw his hood over his head. He identified the cut on his jacket.

The Defendant testified that Mr. Pigram did not attack him and that he had no idea where Mr. Pigram was standing during the incident. He said he first saw Mr. Pigram sitting at the bus stop but did not know where he went when everything escalated. He denied he could feel his knife entering the victim's body. He said that when it was cold outside, layers of coats and clothes were worn and that he did not know the knife stabbed the victim's body. He did not remember wearing gloves. He did not recall his hand or knife stopping at the victim's body. He said he did not run but that he immediately left the park and went to a friend's house. He did not know where he dropped the knife. He said he quit swinging and stabbing when he realized the victim had released him and when he knew he could leave.

He could not say if he would have kept stabbing the victim if the victim had not released him. He denied having any cuts on his hands or markings on his face the following day.

The Defendant testified that he was forty-seven years old. He denied telling anyone about his defending himself. He said he last saw his jacket when he was arrested and wore it to the jail. He said he was told his jacket had been in "Property" since he had been in jail. He said that he felt threatened when the victim grabbed him, spun him around, and pushed him to the ground. He said that he went to Della Hodges's house after the incident and that she was not the same friend he was with before the incident. When asked if the real reason for his running was that he knew he stabbed the victim, he said he ran from the victim because he was scared for his life and because he did not know where the victim's friend was. He denied he ran because he stabbed the victim.

On redirect examination, the Defendant testified that he had been in jail for almost two years and that his telephone calls from the jail could be recorded at any time. He said that another attorney was assigned to his case previously and that defense counsel had been his attorney for fifteen or sixteen months. He said he discussed self-defense with his lawyers. He said that he did not have any bruises on his face and that he tried to ensure he was not hit in the face because of his previous fracture. He denied having injuries that required treatment at the hospital. He denied trying to kill the victim and said he pulled out his knife because he feared for his life. He did not deny causing the victim's injuries.

Upon this evidence, the jury convicted the Defendant of aggravated assault. The trial court sentenced him to twelve years' confinement. This appeal followed.

**I**

The Defendant contends that the evidence is insufficient to support his conviction and that the evidence is insufficient to rebut the presumption of innocence raised by his assertion of self-defense. The State responds that the evidence is sufficient. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

Relevant to this appeal, aggravated assault occurs when a person "[i]ntentionally or knowingly commits an assault . . . and the assault . . .[i]nvolved the use or display of a deadly weapon[.]" T.C.A. § 39-13-102(a)(1)(A)(iii). An assault occurs when a person "(1) [i]ntentionally, knowingly or recklessly causes bodily injury to another[.]" *Id.* at § 39-13-101(a)(1) (2010). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." *Id.* at § 39-11-302(b) (2010). "When acting knowingly suffices to establish an element, that element is also established if a person acts intentionally." *Id.* at § 39-11-301(a)(2) (2010). "[A] person . . . acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* at § 39-11-302(a).

In Tennessee,

> a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

*Id.* at § 39-11-611(b)(1) (2010). Whether a defendant acted in self-defense is a question of fact for the jury. *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994). When determining whether a defendant acted in self-defense, a jury must consider "whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault." *State v. Renner*, 912 S.W.2d 701, 704 (Tenn. 1995).

In the light most favorable to the State, the victim, Mr. Pigram, the Defendant, and another person were at the bus stop on the night of the incident. They had been drinking and smoking crack. The Defendant and the victim began arguing, and the Defendant pulled a knife from his pocket and stabbed the victim in the stomach, the chest, the armpit, and the side. The Defendant stabbed the victim twice, walked away, and returned to stab him twice more. The victim lost consciousness and was transported by ambulance to the hospital. Mr. Pigram and the victim saw the Defendant with a knife. Furthermore, the Defendant admitted having a knife and causing the victim's injuries.

Although the Defendant claimed the victim attacked him and cut his coat with a box cutter, the victim and Mr. Pigram testified to the contrary. The Defendant could not describe the box cutter, and no knife or box cutter was found at the scene or on the victim. Mr.

Pigram agreed that the victim was the one who first "laid hands" on the Defendant. Although Mr. Pigram said the victim pursued the Defendant and grabbed him, he stated the victim was not violent. The jury's verdict reflects that it rejected the Defendant's claim of self-defense.

We conclude that a rational trier of fact could have found beyond a reasonable doubt that the Defendant did not act in self-defense and committed an aggravated assault. The evidence is sufficient to support his conviction. He is not entitled to relief on this basis.

## II

The Defendant contends that the trial court erred in refusing to send the exhibits to the jury room during deliberations. He argues that he specifically requested his jacket be sent with the jury for deliberations because it was central to his assertion of self-defense and that Tennessee Criminal Procedure Rule 30.1 required that the exhibits go to the jury room during deliberations. The State responds that the jury had access to the Defendant's jacket and that the trial court properly exercised its discretion in administering Rule 30.1. We conclude the failure was harmless error.

Rule 30.1 provides that "[u]nless for good cause the court determines otherwise, the jury shall take to the jury room for examination during deliberations all exhibits and writings, except depositions, that have been received in evidence." Tenn. R. Crim. P. 30.1. The Advisory Commission Comments further provide that the rule is mandatory unless the judge

> either on motion of a party or sua sponte, determines that an exhibit should not be submitted to the jury. Among the reasons why a particular exhibit might not be submitted are that the exhibit may endanger the health and safety of the jurors, the exhibit may be subjected to improper use by the jury, or a party may be unduly prejudiced by submission of the exhibit to the jury.

Tenn. R. Crim. P. 30.1, Advisory Comm'n Cmts.

After closing arguments, the trial court addressed the jury and stated that it would send "all the evidence" with the jury during deliberations but clarified by stating "all the photographs." The court told the jury,

> I'm going to hold all the items of clothing in here, and if you want to see them, I'll send them back with you, but that will be strictly up to you, but I'll keep them in here so while you're deliberating, if there's anything you want to see, . . . let me know and I'll bring you in here and let you look at it. I don't

normally send bloody clothes and items like that back to the jury room, but you're welcome to look at it at any point, at any time. You let me know and I'll bring you out here and let you see that.

After this instruction, defense counsel asked to approach the bench and requested the Defendant's jacket be sent with the jury because it was central to the defense and was not a biohazard. The court stated that it accepted counsel's request but that it normally did not send clothes with the jury and that if the jury wanted to see the clothes, the jury could come to the courtroom and see them at any time. The court stated that to "just to pick and choose and send some items back and some items not back . . . would be - -" but did not finish its reasoning for not sending one item of clothing back but not others. After explaining that it was not the court's procedure to send clothes with the jury and that "everybody handles all these things with gloves, and they've got stickers all over them," the court stated that "if one piece does and one piece doesn't, I just don't think it's appropriate."

At the conclusion of the bench conference, the trial court addressed the jury again and stated, "I want to make it very clear to you. Any of these items of clothing in these bags, you're more than welcome to examine them." The court said that the jury could examine the clothes before leaving or at any time during deliberations and that it would provide gloves if needed. The court said that it did not normally send clothes with the jury during deliberations but that if the jury wanted the clothing in the jury room, it would send it.

The Advisory Commission Comments provide that a particular exhibit might not be submitted to the jury if it "may endanger the health and safety of the jurors." The trial court was permitted to determine *sua sponte* not to send "send bloody clothes and items like that" with the jury for deliberations. However, no evidence exists showing that the Defendant's jacket had blood on it. The Defendant wanted the jury to have the jacket during deliberations to observe the cut that he alleged was caused by the victim. The court's concern about blood or labels that were on the clothes did not apply to the jacket, and the court stated no basis to prevent the jury from taking the jacket to view during deliberations. No good cause was shown to keep the jacket from the jury. The concerns voiced by the Advisory Commission were not present with the jacket, and we do not perceive any other legitimate reason why the jacket should not have been sent with the jury.

We conclude, though, that the trial court's failure to allow the jury to take the jacket for its deliberations was harmless error. *See* T.R.A.P. 36(b). The jury saw the jacket during Ms. Hart's and the Defendant's testimony and heard the Defendant's explanation for the cut on the jacket. The jury was instructed that it could request to view the clothes during deliberations and that the court would provide access to the clothes and gloves to handle it. The Defendant is not entitled to relief on the issue.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON,  PRESIDING JUDGE