IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 20, 2025

## KEJUAN KING v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 17-02085      Carlyn L. Addison, Judge

_____

### No. W2024-01044-CCA-R3-PC

_____

Petitioner, Kejuan King, appeals the denial of his petition for post-conviction relief, claiming the post-conviction court erred in concluding that he received the effective assistance of trial counsel related to his conviction for second degree murder and his resulting twenty-five-year sentence. Petitioner argues that trial counsel failed to adequately investigate Petitioner's self-defense claim, failed to effectively present a self-defense theory at trial, and failed to advocate against certain jury instructions. Petitioner further argues that the cumulative effect of trial counsel's failures amounts to a Sixth Amendment violation. After review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., and TIMOTHY L. EASTER, J., joined.

John P. McNeil, Memphis, Tennessee, for the appellant, Kejuan King.

Jonathan Skrmetti, Attorney General and Reporter; Courtney N. Orr, Deputy Attorney General; Abigail H. Hornsby, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Monica A. Timmerman, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background[1]

On the afternoon of January 13, 2017, Adarrell Anderson ("the victim") arrived at the Grizzly Mart gas station and store with two friends, Anthony Holloway and Julin Sanders. *See State v. King*, No. W2020-01628-CCA-R3-CD, 2022 WL 363963, at *1 (Tenn. Crim. App. Feb. 8, 2022), *no perm. app. filed*. As the trio pulled into the parking lot, they noticed a silver, four-door Hyundai car entering the parking lot from the opposite direction. *Id*. at *1-2. All three men recognized Petitioner as the front passenger in the Hyundai. *Id*. The Hyundai parked next to pump four, with the front of the car pointed away from the store. *Id*. *1, *4. The female driver of the Hyundai got out and went into the store while Petitioner remained seated in the front passenger seat. *Id*. Petitioner's two young children were also in the Hyundai at the time. *Id*. at *4. While Petitioner remained seated, the victim approached on foot to Petitioner's front passenger door. *Id*. at *1-2. Petitioner testified that he did not see the victim approach until the victim was already standing at the car door. *Id*. Petitioner and the victim exchanged words, although accounts differed on how long the exchange lasted. *Id*. at *1-3, *5. Petitioner then fired five or six gunshots from his seated position in the Hyundai, striking the victim. *Id*. at *5. Paramedics later pronounced the victim deceased at the scene. *Id*. In the seconds after the shooting, at least three eyewitnesses heard Petitioner yell, "Come on! Come on!" and watched as the female driver of the Hyundai—later identified as Nakia Moore—ran from the store back to her car before speeding away. *Id*. at *1-2. Mr. Holloway immediately called the victim's family and then 911. *Id*. at *1.

Memphis Police Department ("MPD") Officers Gregory Turner and Nate Lenow were the first to respond to the scene. *Id*. at *3. Officer Turner's body camera footage, which was played for the jury, showed a response time of two minutes and four seconds from the time he received the radio call to the time he arrived. When asked on cross-examination whether he knew the victim, Officer Turner responded that he did not know him personally but had "made a call" to his residence at one point before the shooting. The State objected to relevance and requested a jury-out hearing to determine the admissibility of such testimony if Petitioner's trial counsel ("Counsel") intended to introduce any of the victim's prior bad acts. The trial court sustained the objection, and Counsel continued his cross-examination but did not revisit any of Officer Turner's prior interactions with the

---

[1] Our prior opinions in this case provide extensive background facts for both the trial and post-conviction proceedings. *See King v. State*, No. W2024-01044-CCA-R3-PC, 2025 WL 2218850, at *1 (Tenn. Crim. App. Aug. 5, 2025), *no perm. app. filed*; *State v. King*, No. W2020-01628-CCA-R3-CD, 2022 WL 363963, at *1 (Tenn. Crim. App. Feb. 8, 2022), *no perm. app. filed*.

victim. Officer Lenow testified that he and Officer Turner arrived at the scene of the shooting simultaneously.

MPD Officer David Smith was one of the crime scene technicians who processed the scene at the Grizzly Mart. *Id*. at \*3. He collected a spent shell casing from the victim's pants leg and photographed a bullet defect to the hooded area of the victim's sweatshirt. *Id*. He also photographed a bullet strike on the rear side of a white work van, which was parked next to where the victim had fallen after being shot, and a possible bullet strike on the concrete near where the victim fell. *Id*. When asked if he recovered anything else from the scene, Officer Smith responded no. Police did not recover a weapon from the victim.

Tennessee Bureau of Investigation ("TBI") Special Agent Cervinia Braswell testified as an expert in firearms identification for the State. *Id*. at \*4. She compared the spent shell casing recovered from the victim's pants leg to a test fired shell casing from the handgun that police recovered from Petitioner's mother. *Id*. Upon comparison, Special Agent Braswell determined that the spent shell casing recovered from the victim was fired from that handgun. *Id*.

Forensic pathologist, Dr. Kevin Jenkins, performed the autopsy on the victim and testified for the State at trial. *Id*. He concluded that the cause of death was multiple gunshot wounds and the manner of death was homicide. *Id*. He testified that the victim suffered four gunshot wounds to his head, torso, and right hip. *Id*. During the autopsy, he collected bullet fragments from three of the four gunshot wounds. *Id*. The fourth gunshot wound entered the front of the victim's right hip and exited in the back without leaving fragments. *Id*. Dr. Jenkins also confirmed that gunshot residue samples were collected from the victim's hands and submitted to the TBI. *Id*. Per TBI protocol, however, the samples were not tested. *Id*.

At trial, Petitioner admitted to shooting the victim but claimed self-defense. *Id*. at \*5. He claimed that he only fired after he saw the victim "come out of his pocket with something" and that he feared for his young daughter's safety, who was in the front seat with him at the time of the shooting. *Id*. He further said that he fled the scene and remained in hiding for five days before turning himself in to police because he received threats and feared retaliation from the victim's friends and family. *Id*. On cross-examination, Petitioner denied telling Cheryl King, who was his sister and the victim's girlfriend, that he planned to kill the victim the day before the shooting. *Id*.

Following a jury-out hearing, the trial court found that Petitioner was a felon in possession of a handgun at the time of the shooting. Accordingly, the court concluded that Petitioner was engaged in unlawful activity at the time of the shooting and thus not entitled to a "no duty to retreat" instruction. Rather, the trial court instructed the jury that Petitioner

had an affirmative duty to retreat but otherwise charged the jury on self-defense.[2] The court also charged the jury with a flight instruction. *Id*. at *8. After deliberating, the jury convicted Petitioner of second degree murder. *Id.* at *8. Following his conviction and a subsequent sentencing hearing, the trial court imposed a twenty-five-year sentence of confinement. *Id*.

Following sentencing, Counsel failed to timely file a motion for new trial and did not file a notice of appeal. *See King*, 2025 WL 2218850, at *1, *2. He then withdrew from representation on November 26, 2018. *Id*. After being appointed new counsel, Petitioner filed a petition for post-conviction relief, seeking a delayed motion for new trial and delayed appeal based on his claim of ineffective assistance of trial counsel. *Id*. at *2. The trial court stayed the post-conviction proceedings, ordered the filing of an amended motion for new trial, and authorized the delayed appeal. *Id*. Accordingly, Petitioner filed an amended motion for new trial, which was denied by the trial court in November 2020, and a delayed appeal followed. *Id*. On direct appeal, Petitioner challenged: (1) the trial court's denial of the admission of the victim's prior bad acts; (2) the State's failure to properly manage evidence related to the bullet fragments and gunshot residue samples collected during the autopsy (i.e., the *Ferguson* claim[3]); and (3) the sufficiency of the evidence. *See State v. King*, 2022 WL 363963 at *1. This court affirmed Petitioner's conviction in 2022, concluding that: (1) Petitioner waived appellate review of the admissibility of the victim's prior bad acts because he failed to make an offer of proof of those prior bad acts at trial; (2) he waived appellate review of his *Ferguson* claim because he failed to raise this issue at trial or in his motion for new trial; and (3) the evidence was sufficient to sustain his conviction for second degree murder. *Id*. at *6-9.

Following the denial of his direct appeal, Petitioner filed a second amended petition for post-conviction relief, claiming that Counsel was ineffective for failing to: (1) adequately investigate prior altercations between the victim and Petitioner, including obtaining the victim's arrest records and using a private investigator; (2) request a jury out hearing regarding first aggressor issues; (3) effectively cross-examine and impeach several of the State's witnesses; and (4) advocate against jury instructions related to self-defense and flight. The post-conviction court held an evidentiary hearing in June 2024. The focus of the hearing centered on Counsel's failure to introduce evidence of Petitioner's prior altercations with the victim to support Petitioner's self-defense theory at trial. At the hearing, Petitioner offered the testimony of his mother, Venetta Harnamji, and Counsel. Petitioner also testified on his own behalf.

---

[2] To aid us in resolving the questions presented, we take judicial notice of the appellate record from Petitioner's direct appeal, which includes the jury charge given in this case. *See* Tenn. R. App. R. 13(c); *State v. Lawson*, 291 S.W.3d 864, 868-70 (Tenn. 2009).

[3] *State v. Ferguson*, 2 S.W.3d 915 (Tenn. 1999).

Ms. Harnamji testified about a series of violent encounters involving the victim and members of her family, including her daughter, Cheryl King, and Petitioner. Ms. King and the victim had two children together. In the months leading up to the shooting, Ms. Harnamji allowed the victim, Ms. King, and their two children to live in her Whitehaven residence. During this time, Ms. Harnamji lived in her second residence in East Memphis. Petitioner also stayed with the victim and Ms. King at the Whitehaven residence until December 2016. Ms. Harnamji recounted multiple instances of domestic violence between Ms. King and the victim during which the police were often called. She recalled one incident where the victim "shot up" her daughter's car and the Whitehaven home after Ms. Harnamji's oldest daughter, Montoya Trezevant, intervened in a domestic dispute between Ms. King and the victim. Ms. Harnamji did not personally witness this incident but testified that "everyone knew what happened." She recalled a second incident in November 2016 where Petitioner intervened in a domestic dispute between Ms. King and the victim. Although Petitioner and the victim were once friends, their relationship deteriorated following Petitioner's intervention in the domestic dispute. Ms. Harnamji stated that following this incident, the victim repeatedly threatened to shoot Petitioner. Ms. Harnamji testified that the victim always carried a gun and that Petitioner would have known this. These threats caused Ms. Harnamji to contact the Shelby County District Attorney General's office in December 2016 to get the victim "off the street before he did anything to anybody." On cross-examination, Ms. Harnamji testified that she never personally witnessed any altercation between Petitioner and the victim and that she was not present when the victim threatened to shoot Petitioner.

Counsel testified that he had tried between 150 and 200 jury trials during his thirty-four years of practice. He previously had represented Petitioner's father and had represented Petitioner on at least two prior occasions. Counsel said he did not utilize a private investigator in this case because he preferred to receive witness statements firsthand. Further, given the facts of the case, he was unable to argue that there was another shooter other than Petitioner because Petitioner admitted to the shooting. Counsel stated that if he had called Ms. King to testify, the State would have impeached her with her statement to police following the shooting that Petitioner told her, on the day before the shooting, that he was going to kill the victim. Counsel believed that if this statement had been introduced, "the case would have been over."

Counsel testified that he decided not to offer Ms. Harnamji as a witness as a matter of trial strategy. He explained that most of Ms. Harnamji's testimony during the post-conviction hearing was inadmissible hearsay because she did not personally hear any threats made by the victim against Petitioner or personally witness any altercation between the two. Moreover, Counsel described Ms. Harnamji as a "strong individual with a lot of character" and believed that "if she went off on a certain route, she'd get chopped up by

the prosecution." Counsel was concerned that her testimony would distract the jury from the self-defense issue.

With respect to the prior altercations between Petitioner and the victim, Counsel explained that he chose not to pursue those issues as a matter of trial strategy. He was concerned about drawing hearsay objections and did not want to appear to be "maligning the deceased." He focused his self-defense theory on Petitioner's reaction at the time of shooting, arguing that Petitioner acted to defend his young children in the car. Counsel further testified that he did not file a pretrial motion to admit evidence of the prior altercations because it was his strategy to avoid such motions to conceal his defense theory before trial. Counsel attempted to find evidence that somebody removed a weapon from the victim's person before police arrived on the scene, but he was unsuccessful in corroborating that theory. He also confirmed that he attempted to recover surveillance footage of the shooting but was unsuccessful. With respect to finding favorable witnesses, Counsel remarked:

> So who's going to come forward and say anything when they know the people who are involved? They know [the victim's] propensity for violence. They know he's a gang member. They know all these things, which of course the jury [doesn't] know, and nobody wants them to know. And you have to steer clear of that. This case was like treading through a minefield.

With respect to his cross-examination of Dr. Jenkins, Counsel testified that he effectively impeached Dr. Jenkins on the failure to test the bullet fragments recovered during the autopsy, which demonstrated the investigation's lack of thoroughness. He stated that Dr. Jenkins was unable to determine who fired the weapon, how many shots were fired, how many entered the victim's body, and from which angle or direction that the bullets entered the victim's body. Counsel considered retaining his own forensic expert but decided against it, concluding that it was better not to "emphasiz[e] things that would probably be left better unsaid." Counsel acknowledged that Petitioner had already admitted to shooting the victim, so the central issue for trial was why the shooting occurred.

Counsel testified that he requested a self-defense jury instruction at the close of State's proof, but the trial court denied the request, citing a lack of evidence of any prior altercation. He acknowledged that "we clearly failed to get the point across to [the court] about" the victim's prior altercations. He attributed this failure to his inability to present a witness whose testimony would not be easily impeached by the State. Counsel further stated that he recalled objecting to the trial court's charging the jury with the flight instruction, noting that Petitioner had a strong motive to remove himself and his children from harm's way.

Petitioner testified that he and the victim once had a good relationship, but their relationship turned sour when Petitioner intervened in a domestic dispute between the victim and Ms. King. According to Petitioner, he intervened a second time a few days later, and the victim responded by threatening Petitioner with a gun. Petitioner recalled a separate incident where he was at the home of a friend, D.C., when the victim showed up at D.C.'s house looking for Petitioner. When D.C. refused to let the victim inside, the victim spat in his face and threatened to shoot into the house. The police were called, but the victim left D.C.'s house before they arrived. Petitioner also corroborated his mother's testimony that the victim had fired at both of Petitioner's sisters as they had left their home and then shot up the house where they were all staying. However, Petitioner admitted that he was not living in Memphis at the time of this incident, which he said occurred around a year and a half before the shooting in this case.

Petitioner testified that the last time he saw the victim before the shooting was two weeks after Thanksgiving 2016. On that day, Petitioner had returned home from the gas station when he noticed the victim following him. Petitioner testified that when he arrived home, the victim exited his vehicle with a gun and stood there without saying anything. Petitioner interpreted this event as an act of intimidation. He further testified that he knew the victim to regularly carry a gun. Petitioner then recounted the day of the shooting, which was consistent with his trial testimony. When asked why he did not testify to any prior altercations at trial, Petitioner explained that Counsel advised him that doing so "wouldn't be a good look" and "wouldn't go good on our behalf."

In July 2024, the post-conviction court issued an order denying post-conviction relief, and the present appeal followed. *See King v. State*, 2025 WL 2218850 at *6. After our initial review, we remanded the case to the post-conviction court for entry of an order consistent with the requirements of Tennessee Code Annotated section 40-30-111(b). *Id.* at *7. We concluded that the post-conviction court's order included only a summary of the evidence presented at the post-conviction hearing and failed to make sufficient findings regarding the credibility, weight, or value of the evidence. *Id.* On August 29, 2025, the post-conviction court entered a revised order.

With respect to Counsel's cross-examination of witnesses, the post-conviction court found that the only proof offered at the evidentiary hearing was Counsel's "successful impeachment" of the State's forensic pathologist. The court credited Counsel's testimony that he impeached Dr. Jenkins on whether the bullet fragments recovered from the victim's body were tested. The post-conviction court concluded Counsel was not deficient on this issue.

Regarding calling other witnesses to support Petitioner's self-defense claim, the court credited Counsel's testimony that he decided against calling both Ms. Harnamji and

Ms. King as a matter of trial strategy, finding that Counsel "expressed a desire to avoid being objected to on hearsay grounds and an unwillingness to malign the deceased." The court determined that these decisions were strategic trial decisions by Counsel. With respect to Counsel's failure to investigate, the court concluded that Petitioner failed to show any prejudice from Counsel's decision not to use a private investigator. Finally, the court concluded that Petitioner did not meet his burden of proof with respect to his challenges to the jury instructions.

After the appellate record was supplemented with the post-conviction court's revised order, neither party filed supplemental briefs.

## Analysis

On appeal, Petitioner claims that the post-conviction court erred in denying post-conviction relief, arguing that Counsel was ineffective for failing to adequately investigate Petitioner's self-defense claim, effectively present a self-defense theory at trial, and advocate against certain jury instructions. Petitioner also argues that Counsel's cumulative error amounts to the ineffective assistance of counsel. The State argues that the post-conviction court did not err. We agree with the State.

Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Both our state and federal Constitutions guarantee the right to effective assistance of counsel. *See* U.S. Const. amend. VI; Tenn. Const. art. 1, § 9. Thus, the denial of effective assistance of counsel is a cognizable claim under our Post-Conviction Procedure Act. *See Phillips v. State*, 647 S.W.3d 389, 400 (Tenn. 2022).

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," and "the petitioner bears the burden of overcoming this presumption." *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citation modified). To meet this burden, a petitioner must clearly and convincingly prove the facts underlying their ineffective assistance of counsel claim. *See* Tenn. Code Ann. § 40-30-110(f). A petitioner must then show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 688, 693 (1984). In practice, a petitioner must prove "the *fact* of counsel's alleged error by clear and convincing evidence," and if that burden of proof is met, the court then must assess under *Strickland* whether that error constitutes ineffective assistance of counsel. *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009) (emphasis in original) (reconciling statutory burden of proof with *Strickland*).

To establish deficient performance, a petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 688. Thus, deficient performance is representation that falls below "an objective standard of reasonableness" as measured "under prevailing professional norms." *Id*. However, counsel has "wide latitude . . . in making tactical decisions." *Id*. at 689. A petitioner must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. (citation modified). A reviewing court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. at 690. Accordingly, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id*.

To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. When the issue is that "trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel." *Id*. Failure to present such witnesses at the evidentiary hearing is a failure to show prejudice under *Strickland*. *Id*. at 758.

Failure to satisfy either prong under *Strickland* results in denial of relief. *Phillips*, 647 S.W.3d at 401; *Strickland*, 466 U.S. at 697. Appellate review of ineffective assistance of counsel claims are mixed questions of law and fact, which are reviewed *de novo*. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). The post-conviction court's factual findings are presumed correct unless the evidence preponderates against them. *Id*. The court's conclusions of law receive no deference or presumption of correctness on appeal. *Id*.

## I. Failure to Investigate

Petitioner argues that Counsel "failed to properly investigate previous altercations and interactions between [Petitioner] and the victim." Specifically, Petitioner takes issue with Counsel's failure to acquire the victim's prior arrest records and use a private investigator. According to Petitioner, the arrest records would have shown that the victim had been violent towards Petitioner's family. On this point, the State argues that Petitioner failed to meet his statutory burden of proof under Tennessee Code Annotated section 40-30-110(f) because he did not offer the arrest records at the evidentiary hearing or otherwise

prove their existence. The post-conviction court found that Petitioner failed to present "sufficient proof" with respect to the victim's prior arrest records. If Petitioner wanted the post-conviction court, and by extension this court, to consider the victim's arrest records, then he should have offered those records at the evidentiary hearing. *See, e.g.*, *Nelson v. State*, No. W2016-02600-CCA-R3-PC, 2018 WL 1040951, at *1, *4 (Tenn. Crim. App. Feb. 22, 2018) (denying relief where petitioner failed to present records at post-conviction hearing which he claimed trial counsel should have presented at trial). Accordingly, Petitioner's claim regarding the arrest records fails.

With respect to not using a private investigator, the post-conviction court credited Counsel's testimony that he would "much rather hear the story for himself" than hear it from a private investigator and that he did not know "what a PI would have managed to accomplish" gathering case information. Counsel further testified that he was aware of the prior altercations between the victim and Petitioner before going to trial, that he received discovery from the State well before trial, and that he interviewed various witnesses concerning the prior altercations. Moreover, Petitioner failed to identify how not using a private investigator prejudiced his defense. As the post-conviction court said in its order: "Petitioner fails to present any evidence past speculation or hindsight as to if the utilization of a private investigator would have provided facts which were unknown to trial counsel at the time of trial. Therefore, this allegation fails." We see nothing in the record that preponderates against the post-conviction court's factual findings or credibility determinations on this point, and we agree that Petitioner has failed to show either deficient performance or prejudice under *Strickland*. *See* 466 U.S. at 688, 694.

## II. Failure to Effectively Present Self-Defense and First Aggressor Claims at Trial

Petitioner argues that Counsel was ineffective because he did not effectively present evidence of prior altercations between Petitioner and the victim at trial. According to Petitioner, such evidence would have supported his self-defense claim. Specifically, Petitioner argues that Counsel was ineffective in failing to: (1) call witnesses who could testify about the prior altercations; (2) request a jury-out hearing related to first aggressor issues; and (3) effectively cross-examine and impeach the State's witnesses.

### A. Failure to Call Witnesses

Petitioner asserts that Counsel was ineffective by failing to call "any witnesses to testify about previous altercations . . . between the Petitioner and the victim." Petitioner argues in his brief that Ms. Harnamji told police that the victim had previously threatened family members and that they had attempted to obtain an order of protection against him. Counsel testified that he made a strategic decision not to call Ms. Harnamji as a witness for two reasons. First, much of Ms. Harnamji's testimony was inadmissible hearsay as she

never personally witnessed any altercation between Petitioner and the victim. Second, Counsel described Ms. Harnamji as a "strong individual with a lot of character" and believed that "if she went off on a certain route, she'd get chopped up by the prosecution." Counsel was concerned that her testimony would distract the jury from the self-defense issue. The post-conviction court credited Counsel's testimony, finding that "the decision to not call [Ms. Harnamji] was not the result of [counsel's deficient performance], but was rather due to the possibility of impeachment . . . ." Accordingly, Counsel made a reasonable, strategic decision to not call Ms. Harnamji as a witness at trial. As *Strickland* points out, this strategic choice is "virtually unchallengeable." *See* 466 U.S. at 690. Accordingly, Petitioner is not entitled to relief.

Although Petitioner argues in his brief that Counsel was ineffective by failing to call multiple witnesses, including Ms. King, he presented only Ms. Harnamji at the post-conviction hearing. Because these other witnesses were not presented at the hearing, we, like the post-conviction court, are not permitted to speculate as to what their testimony might have been, and his claim must fail. *See Black*, 794 S.W.2d at 757.

### B. Failure to Request a Jury-Out Hearing

Petitioner further argues that Counsel was ineffective in not requesting a jury-out hearing related to first-aggressor issues. In support, he references in his brief only the cross-examination of Officer Turner where Counsel attempted to introduce evidence of the victim's prior bad acts through the officer's testimony. The trial court sustained the State's objection to this testimony, and Officer Turner never testified to any of the victim's prior bad acts. To the extent Petitioner relies on this exchange with Officer Turner, we conclude that Petitioner has failed to show prejudice because Officer Turner did not testify at the post-conviction hearing. *See id*. We are unable to speculate as to what Officer Turner's testimony might have been had the jury-out hearing occurred. *See id*.

Petitioner fails to identify in his brief what other testimony should have been presented during the jury-out hearing. *See* Tenn. R. App. P. 27(a); Tenn. Ct. Crim. App. R. 10(b). Aside from Officer Turner's testimony, we are left with only a conclusory statement that Counsel was ineffective in not requesting this hearing. Because Petitioner's briefing is inadequate on this point, we conclude that he has waived further consideration of this issue.

### C. Failure to Effectively Cross-Examine Witnesses

Petitioner argues that Counsel "failed to properly cross-examine and impeach several witnesses," but the only witness identified in Petitioner's briefing is the State's forensic pathologist, Dr. Jenkins. Petitioner argues that Dr. Jenkins "gave multiple theories

for how a bullet, or a ricochet could have struck the back of [the victim's] head, but could not explain who was firing, how many shots were fired, or how many hit [the victim] from which angles."[4]  Petitioner further argues that the Grizzly Mart concrete had "clear signs" of having been struck by a bullet.  According to Petitioner, Counsel failed to effectively cross-examine Dr. Jenkins on these alleged inconsistencies.  However, Petitioner's argument is not supported by the record.

The trial record reflects that Counsel questioned Dr. Jenkins regarding the trajectory of each gunshot wound, whether some of the gunshot wounds could have been caused by ricochet, the recovery and collection of the bullet fragments during the autopsy, and the gunshot residue samples collected from the victim's hands.  In response to Counsel's questioning, Dr. Jenkins testified that the victim suffered "four gunshot wounds, three of which had bullet or bullet fragments recovered from within the body, and one of them went through and through."  The gunshots entered the left side of the back of the victim's skull, his upper left back, his front lower left quadrant of the abdomen, and his front right hip.  Using demonstratives, Dr. Jenkins showed the jury the entry point and trajectory for each gunshot wound.  Counsel then asked: "Now, what if the bullet had struck the ground, which is a concrete surface, would that also have caused an upward movement of the trajectory of . . . the bullet that had to come down from somewhere?"  Dr. Jenkins replied, "The amount of energy remaining from a bullet striking a hard object like that, it wouldn't be enough to cause these injuries."  As to the bullet fragments and gunshot residue samples, Dr. Jenkins testified that he collected and photographed the fragments and then saved them into evidence, but to his knowledge, no other agency tested the fragments for ballistics.  He testified that, per protocol, the victim's hands were wrapped in plastic bags at the scene, and he then collected a sample and submitted it to the State.  Like the bullet fragments, the sample was never tested by investigators.

The post-conviction court concluded that Counsel effectively questioned Dr. Jenkins, crediting his testimony regarding his impeachment of the doctor.  Nothing in the record preponderates against this finding.  Accordingly, we conclude that Counsel's cross-examination of Dr. Jenkins did not fall below "an objective standard of reasonableness" as measured "under prevailing professional norms."  *See Strickland*, 466 U.S. at 688.  Petitioner fails to identify in his brief any additional witnesses who he claims Counsel failed to adequately cross-examine at trial.  Accordingly, this portion of his argument is

---

[4] Petitioner's briefing attributes this quote to an unnamed "ballistics expert."  While TBI Special Agent Braswell testified about matching the spent shell casing recovered from the scene to the handgun recovered from Petitioner's mother, she did not testify with any specificity as to the trajectory of the bullets or the gunshot wounds to the victim.  Dr. Jenkins, however, provided testimony regarding these topics, particularly during cross-examination.  Thus, we read Petitioner's briefing as referring to Dr. Jenkins' testimony.

waived due to insufficient briefing. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b).

### III. Failure to Advocate Against Certain Jury Instructions

Petitioner argues that Counsel was ineffective in failing to effectively advocate for an instruction that Petitioner had no duty to retreat before using deadly force and in failing to effectively challenge the trial court's instruction that Petitioner had a duty to retreat as part of the self-defense instruction. Petitioner also argues that Counsel was ineffective in failing to adequately challenge the trial court's flight instruction. The State disagrees with Petitioner's assessment of the record and argues that the trial court correctly instructed the jury.

### *A. Self-Defense and the Duty to Retreat*

Historically, Tennessee observed the common law rule on self-defense, which included an affirmative duty to retreat before using or threatening to use force. *See, e.g.*, *State v. Kennamore*, 604 S.W.2d 856, 858-59 (Tenn. 1980) (rejecting the "no duty to retreat" rule, which is "sometimes referred to as the 'true man' doctrine . . . ."). Then, in 1989, our General Assembly codified the law on self-defense; in doing so, they included an express provision that eliminated the duty to retreat. *See* Tenn. Code Ann. § 39-11-611(a) (1989); *see also State v. Renner*, 912 S.W.2d 701, 704 (Tenn. 1995) ("With this enactment, Tennessee joined the majority of jurisdictions which adhere to the 'true man' doctrine."). Under the "true man" doctrine, one need not retreat from the threatened attack of another or pause and consider whether it is reasonably possible to flee. *Renner*, 912 S.W.2d at 704. In 2007, our General Assembly again amended the self-defense statute to include language that, in effect, codified the common law "true man" doctrine as described in *Renner*. *See id.* (concluding the "true man" doctrine applies only when the defendant is (1) "without fault in provoking the confrontation, and (2) in a place where he has a lawful right to be . . . ."). The relevant portion of the self-defense statute in effect at the time of the commission of the offense and at the time of Petitioner's trial, read:

> (1) Notwithstanding § 39-17-1322, a person who is *not engaged in unlawful activity* and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

> (2) Notwithstanding § 39-17-1322, a person who is *not engaged in unlawful activity* and is in a place where the person has a right to be has no duty to

retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

> (A) The person has a reasonable belief that there is imminent danger of death or serious bodily injury;

> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

> (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b) (emphasis added).[5]

In the years following the 2007 amendment, various panels of this court differed on whether the "not engaged in unlawful activity" language operated as a complete bar to self-defense (when a defendant was engaged in unlawful activity) or merely modified the privilege of having "no duty to retreat." *See State v. Perrier*, 536 S.W.3d 388, 398 (Tenn. 2017) (providing background). Our supreme court resolved this question in *Perrier*. *See* 536 S.W.3d at 399. *Perrier* held that the phrase "not engaged in unlawful activity" modified only a person's statutory privilege not to retreat and did not operate as a complete bar to asserting self-defense. *Id*. at 399.

In Tennessee, "whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing *State v. Ivy*, 868 S.W.2d 725, 725 (Tenn. Crim. App. 1993)). However, "the trial court makes the threshold determination whether to charge the jury with self-defense," and thus "the trial court should consider whether the State has produced clear and convincing evidence that the defendant was engaged in unlawful activity such that the 'no duty to retreat' instruction would not apply." *Perrier*, 536 S.W.3d at 403.[6] "[T]he phrase 'engaged in unlawful activity' applies only to a person's duty to retreat." *Id*. at 399. Thus, "a person is entitled to a jury instruction that he or she did not have to retreat from an alleged attack only when the person was not engaged in unlawful activity and was in a place the person had a right to be." *Id*. at 401. In *Perrier*, our supreme court did not address whether the unlawful activity by the defendant had to have a causal

---

[5] The provocation factor was also codified in Tennessee Code Annotated section 39-11-611(e)(2).

[6] *Perrier* addressed a former version of the statute that was in effect at the time of the offense and Petitioner's trial. That version required a defendant to "not [be] engaged in unlawful activity[.]" *See* Tenn. Code Ann. § 39-11-611(b)(1) (2014 & 2017 Supp.). Effective July 1, 2021, the statute was amended to require that the defendant "not [be] engaged in conduct that would constitute a felony or Class A misdemeanor[.]"

nexus to the defendant's perceived need to defend himself. *Id*. at 404. Almost two years after Petitioner's trial, this court concluded in *State v. Booker*, No. E2018-01439-CCA-R3-CD, 2020 WL 1697367, at *27 (Tenn. Crim. App. Apr. 8, 2020), *rev'd on other grounds by State v. Booker*, 656 S.W.3d 49 (Tenn. 2022), that there must be a causal nexus "between a defendant's unlawful activity and his or her need to engage in self-defense."

The record reflects that at the close of the State's case-in-chief, the trial court held a hearing outside the jury's presence to determine the admissibility of Petitioner's prior convictions if he testified at trial. The State established that Petitioner had prior felony convictions in Georgia for possession of amphetamine, theft by receiving stolen property, and possession of a firearm during the commission of a dangerous felony, as well as two prior misdemeanor theft convictions from Tennessee. The trial court determined that Petitioner could be questioned regarding all of his prior convictions if he testified at trial. Counsel then announced his intention to seek a jury instruction on self-defense. The trial court found that Petitioner was a convicted felon in possession of a handgun at the time of the offense and that, as a result, Petitioner had a duty to retreat before using deadly force. However, the trial court reserved any decision regarding whether it would issue a self-defense instruction until after Petitioner testified at trial.

After Petitioner testified, the trial court announced that it would instruct the jury on self-defense but include language that Petitioner had a duty to retreat. While the State objected to the instruction, Counsel argued that self-defense was fairly raised based on Petitioner's testimony, and the court agreed. The court instructed the jury as follows:

> Included in the defendant's plea of not guilty is his plea of self-defense.
>
> The defendant would have a right to threaten or use force against the deceased when and to the degree the defendant reasonably believed the force was immediately necessary to protect against the alleged victim's use or attempted use of unlawful force. The defendant would also have a right to threaten or use force intended or likely to cause death or serious bodily injury if the defendant had a reasonable belief that there was an imminent danger of death or serious bodily injury, the danger creating the belief of imminent death or serious bodily injury was real, or honestly believed to be real at the time, and the belief of danger was founded upon reasonable grounds.
>
> In determining whether the defendant's use of force in defending himself was reasonable, you may consider not only his use of force but also all the facts and circumstances surrounding and leading up to it. Factors to consider in deciding whether there were reasonable grounds for the

- 15 -

defendant to fear death or serious bodily injury from the deceased include but are not limited to any previous threats of the deceased made known to the defendant; the character of the deceased for violence, when known to the defendant; the animosity of the deceased for the defendant, as revealed to the defendant by previous acts and words of the deceased; and the manner in which the parties were armed and their relative strengths and sizes.

The use of force against the deceased would not have been justified if the defendant provoked the deceased's use or attempted use of unlawful force, unless the defendant abandoned the encounter or clearly communicated to the deceased the intent to do so, and the deceased nevertheless continued or attempted to use unlawful force against the defendant.

The use of force against another is not justified if the defendant consented to the exact force used or attempted by the other individual.

The burden is on the state to prove beyond a reasonable doubt that the defendant did not act in self-defense.

To convict the defendant, the state must prove beyond a reasonable doubt that the defendant did not act in self-defense. If from all the facts and circumstances you find the defendant acted in self-defense, or if you have a reasonable doubt as to whether the defendant acted in self-defense, you must find him not guilty.

The law of self-defense requires that the defendant must have employed all means reasonably in his power, consistent with his own safety, to avoid danger and avert the necessity of taking another's life. This requirement includes the duty to retreat, if, and to the extent, that it can be done in safety.

Mere threats of injury or death do not justify a claim of self defense, unless the person making the alleged threats does something to put such threats into execution.

Petitioner claims that Counsel failed to secure a jury-out hearing to determine whether Petitioner was engaged in unlawful activity that prevented an instruction that he had no duty to retreat before engaging in deadly force. This is refuted by the record which clearly establishes that the trial court held a hearing, determined that Petitioner was engaged in unlawful activity as a felon in possession of a firearm at the time of the offense,

and that he was not entitled to an instruction that he had no duty to retreat. Petitioner makes no claims in his brief regarding what additional arguments that Counsel could have or should have made in an effort to challenge the trial court's ruling and to persuade the trial court to change its ruling. Petitioner makes no claim that by possessing and employing the gun at the time of the offense, he was not committing the offense of felon in possession of a handgun. Petitioner also does not argue that there was no causal nexus between his unlawful possession of the handgun and his need to engage in self-defense or otherwise cite to any authority. Rather, his argument of ineffective assistance of counsel is based on his claim that the trial court failed to hold any hearing on the issue, a claim that is not supported by the record. Accordingly, Petitioner has failed to establish deficient performance.

Petitioner further argues that Counsel failed to "request correct language after the Court made the determination of engaging in unlawful activity." Petitioner appears to argue that Counsel was ineffective in failing to object to the trial court's instruction that the requirement that Petitioner "employed all means reasonably in his power, consistent with his own safety, to avoid danger and avert the necessity of taking another's life" included "the duty to retreat, if, and to the extent, that it can be done in safety." Petitioner relies on this court's opinion in *State v. Taylor*, filed more than five years after Petitioner's trial, in which this court held that the self-defense instruction issued in that case violated the defendant's right to a jury trial "by failing to inform the jury that the [d]efendant had a right to self-defense so long as he first fulfilled his duty to retreat." *State v. Taylor*, No. W2023-00115-CCA-R3-CD, 2024 WL 1697775, at *16 (Tenn. Crim. App. Apr. 19, 2024), *no perm. app. filed*. Yet the instruction issued by the trial court in this case does not suffer from the same defect as the instruction in *Taylor*. Rather, the instruction informed the jury that Petitioner had a right to self-defense if he "employed all means reasonably in his power, consistent with his own safety, to avoid danger and avert the necessity of taking another's life. This requirement includes the duty to retreat, if and to the extent, that it can be done in safety." This was a correct statement of the law and this court has upheld the exact language utilized by the trial court during Petitioner's trial. *See State v. Murphy*, 676 S.W.3d 91, 103 (Tenn. Crim. App. 2023). Accordingly, Petitioner has failed to establish that Counsel's failure to object to the language in the instruction resulted in prejudice.

### B. Flight Instruction

Petitioner also argues that Counsel was ineffective for failing to put on sufficient proof to avoid the trial court's flight instruction. However, as the State points out, Petitioner testified about why he fled the scene and waited five days before surrendering to police. He testified that he fled the scene because he was scared for his daughters and saw one of the victim's friends approaching the vehicle just after the shooting. *See State v. King*, 2022 WL 363963 at *5. After leaving the store, Petitioner called his mother, who

then called a lawyer. *Id*. Petitioner testified that he did not turn himself in immediately on advice from that lawyer. *Id*. Despite this testimony, the court found that a flight instruction was proper and issued the instruction to the jury. Although Petitioner claims that Counsel should have presented additional proof to thwart the flight instruction, Petitioner failed to identify during the post-conviction hearing or in his brief what additional proof that he claims should have been presented. Thus, Petitioner failed to establish that Counsel was deficient.

## IV. Cumulative Error

Petitioner argues that Counsel's performance "if not for individual instances, then cumulatively over the course of the case" constitutes ineffective assistance of counsel. However, "in the context of an ineffective assistance of counsel claim, cumulative error examines the prejudicial effect of multiple *instances of deficient performance*." *Harris v. State*, No. E2022-00446-CCA-R3-PC, 2022 WL 17729352, at *1, *9 (Tenn. Crim. App. Dec. 16, 2022) (citation modified) (emphasis added). "To that end, and perhaps obviously, a petitioner who has failed to show that he received constitutionally deficient representation on any single issue may not successfully claim that his constitutional right to counsel was violated by the cumulative effect of counsel's errors." *Conaser v. State*, No. M2023-00271-CCA-R3-PC, 2024 WL 244964, at *1, *7 (Tenn. Crim. App. Jan. 23, 2024) (citation modified), *no perm. app. filed*. Petitioner has failed to establish multiple instances of deficient performance. As such, we conclude he is not entitled to relief based on cumulative error.

## Conclusion

For the reasons above, we affirm the judgment of the post-conviction court.

_____  
s/ Matthew J. Wilson  
MATTHEW J. WILSON, JUDGE
